73 P.3d 687

**David MATSUURA, Individually and dba Orchid Isle Nursery, and Stephen Matsuura, Individually and dba Hawaiian Dendrobium Farm, Plaintiffs–Appellees,**

v.

**E.I. DU PONT DE NEMOURS AND COMPANY, Defendant–Appellant.**

**No. 24355.**

Supreme Court of Hawai'i.

July 29, 2003.

150

Warren Price, III (Kenneth T. Okamoto, Terence S. Yamamoto, Robert A. Marks, with him on the briefs), of Price Okamoto Himeno & Lum, Honolulu; and A. Stephens Clay, James F. Bogan, III, and C. Allen Garrett, Jr. (also on the briefs), of Kilpatrick Stockton LLP, Atlanta, GA, pro hac vice, for defendant-appellant E.I. duPont de Nemours and Company.

Stephen T. Cox (San Francisco, CA), pro hac vice; (Carl H. Osaki; Kris A. LaGuire; and A. Camden Lewis (Columbia, SC), with him on the brief), for plaintiffs-appellants David and Stephen Matsuura.

MOON, C.J., LEVINSON, NAKAYAMA, and RAMIL,[1] JJ., ACOBA, J., concurring and dissenting, separately.

Opinion of the Court by MOON, C.J.

The United States District Court for the District of Hawai‘i (U.S. district court), the Honorable David Alan Ezra presiding, certified the following questions of Hawai‘i law to this court, pursuant to Hawai‘i Rules of Appellate Procedure (HRAP) Rule 13 (2001):[2]

1. Under Hawai‘i law, is a party immune from liability for civil damages based on that party's misconduct, including fraud, engaged in during prior litigation proceedings?

2. Where plaintiffs' attorneys and others have accused the defendant of fraud and dishonesty during the course of prior, related litigation, are plaintiffs thereafter precluded as a matter of law

---

1. Associate Justice Ramil, who heard oral argument in this case, retired from the bench on December 30, 2002. *See* Hawai‘i Revised Statutes (HRS) § 601–10.

2. HRAP Rule 13 states in pertinent part:
    When a federal district or appellate court certifies to the Hawai‘i Supreme Court that

there is involved in any proceeding before it a question concerning the law of Hawai‘i that is determinative of the cause and that there is no clear controlling precedent in the Hawai‘i judicial decisions, the Hawai‘i Supreme Court may answer the certified question by written opinion.

from bringing a cause of action for fraudulent inducement to settle because they should not have relied on the Defendant's representations?

3. Does Hawai'i law recognize a civil cause of action for damages for intentional and/or negligent spoliation of evidence?

## I. BACKGROUND [3]

### A. Benlate Litigation in Hawai'i

On November 4, 1992, plaintiffs David and Steven Matsuura (collectively, the Matsuuras), commercial nurserymen, filed suit against defendant E.I. du Pont de Nemours & Company (DuPont) in two separate actions in the Circuit Court of the Third Circuit.[4] Both actions alleged damages arising out of the use of Benlate, an agricultural fungicide produced by DuPont, that was contaminated with herbicides, which resulted in damage to plants and soil. The Matsuuras were represented by attorney Kevin Malone, who additionally represented over 200 similarly situated plaintiffs in Hawai'i and Florida and in other cases filed across the country.

In July 1993, the first trial involving Benlate [hereinafter, the Bush Ranch case] commenced in federal court in Columbus, Georgia. Mr. Malone monitored this litigation for reference in his Benlate cases. According to the Matsuuras, DuPont, during the Bush Ranch case: (1) misrepresented critical test results performed by Alta Laboratories[5] (Alta test results) that demonstrated that Benlate was contaminated with herbicides; (2) withheld evidence of widespread contamination of Benlate; and (3) withheld field tests demonstrating that Benlate was harmful to plants. On August 16, 1993, while the jury in the Bush Ranch case was deliberating, the Bush Ranch parties settled.

On September 14, 1993, the Matsuuras' cases were consolidated for discovery purposes with seventy other Hawai'i cases involving Benlate. On November 15, 1993, the Honorable Ronald Ibarra conducted a hearing on the plaintiffs' motion seeking the Alta test results, which were not previously produced by DuPont. DuPont asserted that this data was protected by the attorney work product privilege. The plaintiffs alleged that the Alta test results, along with certain other documents, were "smoking gun" evidence that Benlate contained herbicides. The evidence was the subject of various discovery motions throughout 1993 and 1994 in Hawai'i cases as well as in other Benlate cases around the country.

By May 1994, DuPont had finally produced the Alta test results to those plaintiffs who had not settled their cases. One such case was the Kawamata Farms case, which went to trial in June 1994 before Judge Ibarra. Trial was completed in January 1995. During trial, the Kawamata Farms plaintiffs utilized the test results that had been withheld during the Bush Ranch case, i.e., the Alta test results as well as evidence from the so-called "Keeler documents," released in June 1994, which also showed that Benlate may have been contaminated with toxins. Ultimately, the Kawamata Farms plaintiffs prevailed and were awarded nearly $10 million in compensatory damages and more than $14 million in punitive damages. Kawamata Farms v. United Agri Products, 86 Hawai'i 214, 948 P.2d 1055 (1997). In addition, Judge Ibarra found that DuPont had engaged in serious discovery violations with respect to the disclosure of information and imposed sanctions of $1.5 million payable to the State of Hawai'i. Id. Moreover, after the verdict was entered, the Kawamata Farms plaintiffs learned of additional discovery violations, which they brought to the court's attention in

---

**3.** The background facts are derived primarily from the U.S. district court's certificate (certificate), which contains "a statement of prior proceedings in the case, a statement of facts showing the nature of the cause ... and the circumstances out of which the question arises," as required by HRAP Rule 13(b).

**4.** Matsuura v. E.I. Du Pont de Nemours & Co., Civil No. 92–508 (David Matsuura and Orchid

Isle Nursery); Matsuura v. E.I. Du Pont de Nemours & Co., Civil No. 92–501 (Stephen Matsuura and Hawaiian Dendrobium Farm).

**5.** Alta laboratories was one of the few laboratories, if not the only one, capable of performing the sophisticated soil and water analysis to determine if Benlate was contaminated with herbicides known as suflonylureas [hereinafter, SUs].

August and September 1995 via motion pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 60(b)(3) (1995).[6]  *Id.*  Judge Ibarra then further sanctioned DuPont by, *inter alia*, awarding the *Kawamata Farms* plaintiffs their attorneys' fees and costs.  *Id.*

DuPont appealed from the judgment in the *Kawamata Farms* case, and this court affirmed the jury's verdict, the $1.5 million sanction, and the sanctions awarded pursuant to HRCP Rule 60(b)(3).  *Id.*  In affirming the trial court, this court held that "DuPont committed discovery fraud upon the circuit court and the other parties."  *Kawamata Farms*, 86 Hawai'i at 257, 948 P.2d at 1097.  We further characterized the nature of DuPont's fraud as "egregious" and an "unusual, unique example of unprecedented discovery fraud perpetrated against the court."  *Kawamata Farms*, 86 Hawai'i at 258, 948 P.2d at 1098.[7]

The disclosure of the Alta test results in the *Kawamata Farms* trial was the first time many of these results were made public.  *See In re: E.I. du Pont de Nemours & Co.— Benlate Litigation*, 918 F.Supp. 1524, 1538– 39 (M.D.Ga.1995) [hereinafter, *Bush Ranch I*].  Based on the disclosure of this information, plaintiffs in the *Bush Ranch* case petitioned the United States District Court for the Middle District of Georgia [hereinafter, Georgia district court] for sanctions against DuPont.  Finding, among other things, "DuPont's conduct to be the most serious abuse" the court had ever seen and "the most seri-

ous abuse in legal precedents," the Georgia district court imposed sanctions and contempt penalties totaling $115 million; however, the award was later overturned on procedural grounds.  *Bush Ranch I*, 918 F.Supp. at 1557.[8]

## B.  *The Matsuuras' Settlements and Subsequent Litigation*

On April 26, 1994, the Matsuuras executed settlement agreements with DuPont, in which David Matsuura received $1 million, and Stephen Matsuura received $500,000. As previously indicated, the Alta test results were disclosed in May 1994, and the Keeler documents were released in June 1994.  On November 23, 1994, the Matsuuras' suits were dismissed with prejudice by stipulation. In other words, the settlement agreements were executed before the Alta test results and Keeler documents were released, but the stipulated dismissal was not filed until after the evidence was finally disclosed in the *Kawamata Farms* trial.

On December 10, 1996,[9] approximately two years after the dismissal of their claims and fifteen months after the *Kawamata Farms* plaintiffs filed their motion for relief under HRCP Rule 60(b)(3) based on discovery fraud, the Matsuuras filed a complaint in the U.S. district court against DuPont, alleging fraud, racketeering, abuse of process, infliction of emotional distress, interference with prospective economic advantage, spoliation of

---

**6.**  HRCP Rule 60(b)(3) provides in pertinent part:

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for . . . fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentations, or other misconduct of an adverse party. . . The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken.

**7.**  This court cited the trial court's findings that DuPont engaged in "abusive litigation practices . . . in bad faith" and that "DuPont engaged in fraud and intentional misconduct which abused that judicial process.  DuPont acted in bad faith, wantonly and for oppressive reasons."  *Kawamata Farms*, 86 Hawai'i at 259, 948 P.2d at 1099. The trial court made these findings based on "clear and convincing" evidence.

**8.**  The United States Court of Appeals for the Eleventh Circuit [hereinafter, Eleventh Circuit] ruled that the sanctions awarded in *Bush Ranch I* were punitive and, therefore, could not be imposed without satisfying the requirements of due process.  *In re: E.I. Du Pont De Nemours & Co.—Benlate Litigation*, 99 F.3d 363 (11th Cir. 1996), *cert. denied*, 522 U.S. 906, 118 S.Ct. 263, 139 L.Ed.2d 190 (1997) [hereinafter, *Bush Ranch II*].  On remand, the district court ultimately approved a civil settlement resolving the matter, which required DuPont and Alston and Bird, a law firm, to make payments totaling $11.25 million.  *Matsuura v. Alston & Bird*, 166 F.3d 1006, 1008 (9th Cir.) (citation omitted), *cert. dismissed*, *E.I. duPont Nemours and Co. v. Matsuura*, 528 U.S. 1067, 120 S.Ct. 784, 145 L.Ed.2d 659 (1999).

**9.**  The Matsuura's original complaint was filed on December 10, 1996, and their first amended complaint was filed on January 31, 1997.

evidence, and punitive damages based on Du-Pont's alleged fraud in the discovery and settlement processes. Essentially, the Matsuuras claimed that they were harmed by DuPont's alleged fraudulent conduct because they would have requested more money or refused to settle had they known about the concealed data. DuPont filed a counterclaim, requesting damages pursuant to the clause in the settlement agreement that indemnified DuPont from any future litigation by the Matsuuras. The U.S. district court granted judgment on the pleadings in favor of Du-Pont, ruling that the Matsuuras' claims were barred by the terms of the settlement agreement.

On appeal, the United States Court of Appeals for the Ninth Circuit [hereinafter, Ninth Circuit] reversed. *Matsuura*, 166 F.3d at 1012.[10] The Ninth Circuit held that, under Delaware law (which governed the terms of the settlement agreement), the release provision in the settlement agreement did not bar the Matsuuras' fraud and other claims. The case was remanded to the U.S. district court, and the parties filed a series of motions.

On March 1, 2001, the Matsuuras filed a "Motion for Collateral Estoppel to Preclude Defendant from Re–Litigating Previously Adjudicated Findings of Fraud, Discovery Abuse, and Intentional Withholding of Evidence in the *Kawamata Farms* case" (motion for collateral estoppel). Therein, the Matsuuras seek to preclude DuPont from "re-litigating" the following issues: (1) that DuPont fraudulently and intentionally withheld the Alta test results from Benlate litigants; (2) that DuPont intentionally withheld the Keeler documents from Benlate litigants; and (3)

that the Alta test results included analytical findings, which some experts would construe as evidence that Benlate was contaminated with SUs. The Matsuuras claim that issues (1) and (2) have already been decided in *Kawamata Farms* and that issue (3) was decided by the Eleventh Circuit in *Bush Ranch II*.[11]

On April 19, 2001, DuPont responded by filing two "related or counter motions": (1) a "Motion for Judgment on the Pleadings as to All Plaintiffs' Claims Based on Litigation Conduct" (motion for judgment on the pleadings); and (2) a "Motion for Summary Judgment Based on Plaintiffs' Inability as a Matter of Law to Establish Reasonable Reliance" (motion for summary judgment).[12] In its motion for judgment on the pleadings, Du-Pont asserts that all of the Matsuuras' state law damages claims and their federal RICO claims are barred by the doctrine of litigation immunity. In other words, DuPont argues that it cannot be held liable in a separate tort action for conduct arising from prior litigation. DuPont further asserts that Hawai'i does not recognize a separate tort of spoliation of evidence, and, thus, any claims based on such a tort must be dismissed.

In its motion for summary judgment, Du-Pont asserts that reasonable reliance is an element of the Matsuuras' fraud claim and that the Matsuuras are unable, as a matter of law, to establish that they reasonably relied on DuPont's litigation conduct. Specifically, DuPont maintains that the Matsuuras "knew, at the time of settlement, that DuPont had been repeatedly and extensively accused of making false and inadequate discovery re-

**10.** Shortly after the Ninth Circuit decided this case, the Supreme Court of Delaware addressed the issue (on certification from the Southern District of Florida in a similar DuPont/Benlate case) and essentially agreed with the Ninth Circuit, holding that claims for "settlement fraud" could go forward despite the settlement releases, so long as the damages were reduced by the amount of the original settlement. *See E.I. Du-Pont De Nemours & Co. v. Florida Evergreen Foliage*, 744 A.2d 457 (Del.1999).

**11.** In the background section of its order, the Eleventh Circuit stated "[t]he Alta data included analytical findings which some experts would

construe as evidence that Benlate 50DF was contaminated with SUs." *Bush Ranch II*, 99 F.3d at 365–66.

**12.** Local Rules of Practice for the United States District Court for the District of Hawai'i Rule 7.9 (2001) provides in pertinent part: "Any motion related to the subject matter of the original motion may be filed by the responding party together with the party's opposition and may be noticed for hearing on the same date as the original motion, provided that the motions would otherwise be heard by the same judge."

sponses, and that DuPont was embroiled in motions and proceedings contending that DuPont had engaged and was engaging in discovery fraud, the suppression and destruction of evidence, and other forms of alleged dishonest conduct in discovery." Accordingly, DuPont submits that the Matsuuras could not have "reasonably relied" on any representations made by DuPont.[13]

On May 10, 2001, less than one week before the hearing on the substantive motions, DuPont filed a "Motion for Certification of Questions to the Hawai'i Supreme Court," requesting the U.S. district court to certify questions presented in its two related countermotions. At a hearing on May 16, 2001, the U.S. district court determined that Hawai'i law applied to the Matsuuras' complaint (as opposed to Delaware law, which had applied to the construction of the settlement agreement) and that several of the issues raised by the parties in this case presented novel issues of Hawai'i state law. Therefore, the court indicated its intention to certify these questions and ordered the parties to confer regarding the precise language of the questions to be certified.

On June 20, 2001, the U.S. district court filed a certificate requesting this court to answer the three questions listed *supra.* On June 28, 2001, this court filed an order stating that the certified questions were amenable to answer by this court and ordering, among other things, the parties to submit the record and briefs. On February 8, 2002, this court consolidated this case with *Exotics Hawai'i Kona, Inc. v. E.I. du Pont de Nemours and Co.*, No. 24626, for purposes of oral argument, which was heard on April 18, 2002.

## II. DISCUSSION

### A. Liability for Litigation Misconduct Including Fraud

As previously stated, the first certified question asks:

Under Hawai'i Law, is a party immune from liability for civil damages based on that party's misconduct, including fraud, engaged in during prior litigation proceedings?

Hawai'i courts have applied an absolute litigation privilege in defamation actions for words and writings that are material and pertinent to judicial proceedings. *See Abastillas v. Kekona*, 87 Hawai'i 446, 447, 958 P.2d 1136, 1137 (1998) (noting that the Intermediate Court of Appeals (ICA) affirmed the circuit court's dismissal of a libel action against an attorney based upon "absolute immunity"); *Ferry v. Carlsmith*, 23 Haw. 589, 591 (1917) (adopting an absolute privilege for communications made by attorneys "in the conduct of judicial proceedings," discussed in greater detail *infra* ); *Hall v. State*, 7 Haw.App. 274, 285, 756 P.2d 1048, 1056 (1988) (holding that a deputy attorney general's alleged defamatory statements made in preparation of the defense of his clients were absolutely privileged); *McCarthy v. Yempuku*, 5 Haw.App. 45, 48, 678 P.2d 11, 14 (1984) (noting that the Hawai'i Supreme Court has adopted an absolute litigation privilege).

DuPont urges this court to follow those jurisdictions that have expanded the protection of the litigation privilege to claims outside of defamation actions.[14] DuPont also argues that allowing subsequent suits based upon prior litigation misconduct: (1) runs contrary to the policy against derivative litigation; (2) ignores the interest in finality of

---

**13.** Both of DuPont's motions rely largely on *Florida Evergreen Foliage v. E.I. Du Pont De Nemours and Co.*, 135 F.Supp.2d 1271 (S.D.Fla.2001) [hereinafter, *Florida Evergreen I*], another Benlate "settlement fraud" case substantially similar to the one at bar. In *Florida Evergreen I*, the United States District Court for the Southern District of Florida held that, under Florida law, the doctrine of litigation immunity barred all state law claims based on prior litigation conduct. *Id.* at 1278–83. It further granted judgment to DuPont on the plaintiffs' fraud claims, finding that the plaintiffs were unable as a matter of law to meet the "reasonable reliance" require-

ment under Florida law. *See id.* at 1289–98. A petition for interlocutory appeal of this decision is currently pending before the Eleventh Circuit.

**14.** DuPont cites, *inter alia, Silberg v. Anderson*, 50 Cal.3d 205, 266 Cal.Rptr. 638, 786 P.2d 365, 370–71 (1990); *Bruce v. Byrne–Stevens & Assocs. Eng'rs., Inc.*, 113 Wash.2d 123, 776 P.2d 666, 670–71 (1989); *Hughes v. Long*, 242 F.3d 121, 130 (3d Cir.2001); *Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v. United States Fire Ins. Co.*, 639 So.2d 606, 608 (Fla.1994).

judgments indicated by HRCP Rule 60(b);[15] and (3) threatens the fundamental public policy favoring the compromise of disputes.

The Matsuuras maintain that: (1) this court should not expand the litigation privilege beyond defamation actions; (2) under authorities cited by DuPont, the misconduct alleged in the instant case is not protected by the privilege;[16] and (3) this court should not follow the decision of Judge Gold in *Florida Evergreen I* because it was based upon an erroneous interpretation of Florida law. The Matsuuras also address policy concerns, arguing that allowing a party to be held liable for litigation misconduct: (1) reinforces the integrity of the legal system; (2) encourages voluntary settlement of disputes; (3) does not encourage collateral litigation; (4) ensures just compensation for victims; and (5) discourages abusive litigation practices.

## 1. Policies Underlying the Litigation Privilege

■ The scope of any privilege is based upon policy considerations. *See generally Blair v. Ing*, 95 Hawai'i 247, 263, 21 P.3d 452, 468 (2001); *Abrams v. Cades, Schutte, Fleming & Wright*, 88 Hawai'i 319, 325, 966 P.2d 631, 637 (1998). As noted by the authorities discussed *infra*, the interrelated policies associated with the litigation privilege include: (1) promoting the candid, objective, and undistorted disclosure of evidence; (2) placing the burden of testing the evidence upon the litigants during trial; (3) avoiding the chilling effect resulting from the threat of subsequent litigation; (4) reinforcing the finality of judgments; (5) limiting collateral attacks upon judgments; (6) promoting zealous advocacy; (7) discouraging abusive litigation practices; and (8) encouraging settlement. Therefore, in order to determine whether the litigation privilege should bar a subsequent collateral proceeding for civil damages based on litigation misconduct, including fraud, we

must first address the policies associated with the privilege.

### a. *promoting the candid, objective, and undistorted disclosure of evidence*

The United States Supreme Court (U.S. Supreme Court) has noted that underlying the litigation privilege is "public policy which requires that the paths which lead to the ascertainment of truth should be left as free and unobstructed as possible." *Briscoe v. LaHue*, 460 U.S. 325, 333, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983) (citing *Calkins v. Sumner*, 13 Wis. 193, 197 (1860)). The Court explained:

A witness's apprehension of subsequent damages liability might induce two forms of self-censorship. First, witnesses might be reluctant to come forward to testify. And[,] once a witness is on the stand, his testimony might be distorted by the fear of subsequent liability. Even within the constraints of the witness's oath[,] there may be various ways to give an account or to state an opinion. These alternatives may be more or less detailed and may differ in emphasis and certainty. A witness who knows that he might be forced to defend a subsequent lawsuit, and perhaps to pay damages, might be inclined to shade his testimony in favor of the potential plaintiff, to magnify uncertainties, and thus to deprive the finder of fact of candid, objective, and undistorted evidence.

*Briscoe*, 460 U.S. at 333, 103 S.Ct. 1108 (citing Veder, *Absolute Immunity in Defamation: Judicial Proceedings*, 9 Colum. L.Rev. 463, 470 (1909)); *see also Murphy v. A.A. Mathews, a Division of CRS Group Engineers, Inc.*, 841 S.W.2d 671, 674, *reh'g overruled*, 841 S.W.2d 671 (Mo.1992). Thus, the litigation privilege is based upon the assumption that exposing witnesses to liability may result in distorted evidence presented to the finder of fact.

---

**15.** DuPont cites, *inter alia, Ellis v. Crockett*, 51 Haw. 45, 451 P.2d 814 (1969); *Associated Engineers & Contractors, Inc. v. State*, 58 Haw. 187, 567 P.2d 397, *reh'g denied*, 58 Haw. 322, 568 P.2d 512 (1977); *Ming v. Ho*, 45 Haw. 521, 371 P.2d 379 (1962); *In re Genesys Data Tech., Inc.*, 95 Hawai'i 33, 18 P.3d 895 (2001).

**16.** The Matsuuras cite, *inter alia, Ferry; McCarthy; Myers v. Cohen*, 5 Haw.App. 232, 687 P.2d 6, *rev'd*, 67 Haw. 389, 688 P.2d 1145 (1984); *Giuliani v. Chuck*, 1 Haw.App. 379, 620 P.2d 733 (1980); Cal. Civ.Code § 47(b)(2); *Jones v. Cannon*, 174 F.3d 1271 (11th Cir.1999).

The litigation privilege's purpose of encouraging candid, objective, and undistorted evidence to better enable the finder of fact to uncover the truth is consistent with this court's statements regarding the function of the courts. We have described courts as "forums for the discovery of truth," *State v. Haanio*, 94 Hawai'i 405, 415, 16 P.3d 246, 256 (2001) (quoting *People v. Barton*, 12 Cal.4th 186, 47 Cal.Rptr.2d 569, 906 P.2d 531, 536 (1995)), and have stated that courts perform "two essential tasks: sifting through conflicting versions of the facts to discover where truth lies, and applying the correct legal principles to the facts as found." *Office of Disciplinary Counsel v. Breiner*, 89 Hawai'i 167, 173, 969 P.2d 1285, 1291 (1999) (quoting *In re Vincenti*, 92 N.J. 591, 458 A.2d 1268, 1275 (1983)). Thus, discouraging candid disclosure by witnesses reduces the amount and quality of evidence available to the finder of fact, thereby impairing the court's ability to sift through conflicting versions of the facts to discover the truth.

Generally speaking, policy considerations favor limiting liability for litigation misconduct because the threat of liability might reduce the quantity and quality of evidence available to the finder of fact. However, in the present case, the defendants are alleged to have fraudulently distorted the evidence presented in a prior proceeding. Clearly, such misconduct is directly contrary to the policy of promoting the candid, objective, and undistorted disclosure of evidence. Accordingly, this policy does not favor limiting liability in a subsequent proceeding where there is an allegation of fraud committed in the prior proceeding.

b. *placing the burden of testing the evidence upon the litigants during trial*

The U.S. Supreme Court has stated that "the truth-finding process is better served if the witness's testimony is submitted to 'the crucible of the judicial process so that the factfinder may consider it, after cross-examination, together with the other evidence in the case to determine where the truth lies.'" *Briscoe*, 460 U.S. at 334, 103 S.Ct. 1108. Stated another way, "[I]n immunizing partici-

pants from liability for torts arising from communications made during judicial proceedings, the law places upon litigants the burden of exposing during trial the bias of witnesses and the falsity of evidence." *Silberg*, 266 Cal.Rptr. 638, 786 P.2d at 370.

The litigation privilege helps ensure that the parties diligently investigate and test the evidence in a timely manner. Placing the burden of testing the evidence on the parties potentially limits subsequent claims of newly discovered evidence or fraud and is, therefore, also related to the policy of encouraging the finality of judgments, discussed *infra*. However, withholding and destroying evidence obviously frustrates the policy of placing the burden of testing the evidence upon the litigants. Clearly, parties cannot test what is willfully and wrongfully withheld from them. Therefore, such policy does not favor limiting liability in subsequent proceedings when fraud is uncovered after judgment has been rendered or the case has been settled and dismissed.

c. *avoiding the chilling effect resulting from the threat of subsequent litigation*

Courts serve an important role in resolving conflicts and defining rights. The U.S. Supreme Court has observed that, "[o]ver the course of centuries, our society has settled upon civil litigation as a means for redressing grievances, resolving disputes, and vindicating rights when other means fail." *Zauderer v. Office of Disciplinary Counsel of the Supreme Ct. of Ohio*, 471 U.S. 626, 643, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985). The Court has also noted that it "traditionally has held that the Due Process Clauses protect civil litigants who seek recourse in the courts, either as defendants hoping to protect their property or as plaintiffs attempting to redress grievances." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 429, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982). Consistent with the important role of the courts, we have recognized the importance of meaningful access to them. *See Setala v. J.C. Penney Co.*, 97 Hawai'i 484, 491, 40 P.3d 886, 893 (2002).

The litigation privilege's purpose of encouraging witnesses and parties to take part

in judicial proceedings is based on the premise that the threat of subsequent liability discourages participation. *See Briscoe*, 460 U.S. at 333, 103 S.Ct. 1108. By protecting communications during judicial proceedings, the litigation privilege affords "litigants and witnesses the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions." *Silberg v. Anderson*, 50 Cal.3d 205, 266 Cal. Rptr. 638, 786 P.2d 365, 369 (Cal.1990); *see also Levin, Middlebrooks, Mabie, Thomas, Mayes, and Mitchell, P.A. v. United States Fire Ins. Co.*, 639 So.2d 606, 608 (Fla.1994) [hereinafter, *Levin* ]; *Murphy*, 841 S.W.2d at 674. Hawai'i courts have also recognized that the threat of subsequent litigation affects access to the courts. In the context of an action for malicious prosecution, the ICA noted:

> We do not wish to open the door to a second lawsuit being filed by the defendant every time the plaintiff loses a previous lawsuit, followed, we suppose, by a third lawsuit if the plaintiff in the second lawsuit loses that one and so on ad infinitium. We think that one of the things that distinguishes our society is the citizen's relative freedom of access to the courts. The preservation of that freedom lies behind the basic American rule against allowing attorney's fees to the successful party in litigation except where such is provided by agreement, statute, rule or precedent. To adopt [the policy urged] with respect to granting summary judgments in malicious prosecution suits would be to expose the plaintiffs in the original action to the harassment and expense of malicious prosecution suits without the person bringing the second action having any basis for his claim of malice. *This would tend to discourage resort to the court where irreconcilable conflict exists.*

*Brodie v. Hawaii Automotive Retail Gasoline Dealers Ass'n., Inc.*, 2 Haw.App. 316, 321, 631 P.2d 600, 604 (1981) (emphases added), *rev'd on other grounds*, 65 Haw. 598, 655 P.2d 863 (1982).[17] As the ICA has indicated, liability in subsequent proceedings tends to discourage parties from turning to the courts where an irreconcilable conflict exists. In this manner, the chilling effect resulting from the threat of subsequent litigation hinders access to the courts, which undermines the courts' role in resolving disputes and vindicating rights. Given the importance of access to the courts, the policy of avoiding the chilling effect resulting from the threat of subsequent litigation generally favors limiting liability in subsequent proceedings.

### d. *reinforcing the finality of judgments*

DuPont notes that allowing a party to be held liable for civil damages in a subsequent proceeding based on litigation misconduct conflicts with the policy of encouraging finality of judgments. Although this court has recognized a general policy favoring finality of judgments, *see Shimabuku v. Montgomery Elevator Co.*, 79 Hawai'i 352, 358, 903 P.2d 48, 54 (1995), it has also stated that "a judgment or final order should reflect the true merits of the case." *Magoon v. Magoon*, 70 Haw. 605, 616, 780 P.2d 80, 86 (1989). In *Magoon*, a party sought relief from a final property division, alleging that the final order was procured through fraud. Based on an interpretation of Hawai'i Family Court Rules (HFCR) Rule 60(a) and (b), this court held that the family court had jurisdiction to entertain the motion for relief from the final order. *Magoon*, 70 Haw. at 616, 780 P.2d at 86 (citations omitted). Although the HFCR is not applicable to the present case, this court's observation in *Magoon* is noteworthy:

> HFCR 60(b)(3), like its precursors, Rule 60(b)(3) of the Federal Rules of Civil Procedure and Rule 60(b)(3) of the Hawaii Rules of Civil Procedure, codifies a well-recognized exception to the finality principle; it has been "formulated to permit relief in several of the situations in which the desire for truth is deemed to outweigh the value of finality."

*Magoon*, 70 Haw. at 616 n. 4, 780 P.2d at 86 n. 4 (citations and brackets omitted). Thus, HRCP Rule 60(b)(3), *see supra* note 6, re-

---

17. This court expressly concurred "with the appellate court's exposition of the law governing malicious prosecution and motions for summary judgment relating thereto." *Brodie*, 65 Haw. at 599, 655 P.2d at 864.

flects this court's preference for judgments on the merits over the finality of judgments procured through fraud.

Additionally, HRCP Rule 60(b) states, "This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to set aside a judgment for fraud upon the court." The Federal Rules of Civil Procedure (FRCP) contain a similar provision, which courts have interpreted to remove any fixed time limit to directly attack a judgment based on fraud upon the court. *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1337–38 (5th Cir.), *reh'g denied*, 578 F.2d 871 (1978); *Serzysko v. Chase Manhattan Bank*, 461 F.2d 699, 701–02 (2d Cir.), *cert. denied*, 409 U.S. 883, 93 S.Ct. 173, 34 L.Ed.2d 139 (1972); *Wilkin v. Sunbeam Corp.*, 405 F.2d 165, 166 (10th Cir.1968); *Dausuel v. Dausuel*, 195 F.2d 774, 775 (D.C.Cir.1952). Based upon the persuasive authority of federal interpretations of the FRCP, this court has indicated that the one-year limitation in HRCP Rule 60(b) is not applicable when fraud was committed upon the court. *In re Genesys*, 95 Hawai'i 33, 37 n. 4, 18 P.3d 895, 899 n. 4 (2001); *but see Hayashi v. Hayashi*, 4 Haw.App. 286, 292, 666 P.2d 171, 175–76 (1983) (noting that there is no relief in equity when the movant "had an adequate remedy at law or could have opened, vacated, modified the decree or judgment, or obtained relief in the original action by exercising proper diligence, or where the situation from which relief is sought has been caused by movant's own fault, neglect, inadvertence or carelessness"). Thus, the relief available under HRCP Rules 60(b) and 60(b)(3) reflect the preference for judgments on the merits over the finality of judgments, especially when such judgments are procured through fraud. Accordingly, when there is an allegation of fraud, the policy of reinforcing the finality of judgments does not favor limiting liability in a subsequent proceeding.

### e. *limiting collateral attacks upon judgments*

A collateral attack is an attempt to impeach a judgment or decree in a proceeding not instituted for the express purpose of annulling, correcting or modifying such judgment or decree. The word "collateral", in this connection, is always used as the antithesis of "direct", and it is therefore wide enough to embrace any independent proceeding. To constitute a *direct* attack upon a judgment, it is said, it is necessary that a proceeding be instituted for that very purpose. If an appeal is taken from a judgment, or a writ of error, or if a motion is made to vacate or set it aside on account of some alleged irregularity, the attack is obviously direct, the sole object of the proceeding being to deny and disprove the apparent validity of the judgment. But *if that action or proceeding has an independent purpose and contemplates some other relief or result, although the overturning of the judgment may be important or even necessary to its success, then the attack upon the judgment is collateral* and falls within the rule.

*Kapiolani Estate, Ltd. v. Atcherly*, 14 Haw. 651, 661 (1902) (citations and some quotation marks omitted) (italics in original) (underscored added). As previously stated, the Matsuuras' present action includes claims of fraud, racketeering, abuse of process, infliction of emotional distress, interference with prospective economic advantage, spoliation of evidence, and punitive damages. Thus, the present action has a purpose independent of overturning the judgment of the third circuit court and contemplates relief other than that sought in the original action. Therefore, the present action is a collateral attack upon the stipulated dismissal granted on November 23, 1994.

This court has stated that, as "a general rule, a collateral attack may not be made upon a judgment or order rendered by a court of competent jurisdiction. If it is only a question of error or irregularity and not of jurisdiction, it cannot be raised on collateral attack." *First Hawaiian Bank v. Weeks*, 70 Haw. 392, 398 772 P.2d 1187, 1191 (1989) (brackets, citations, and internal quotation marks omitted); *see also State v. Grindling*, 96 Hawai'i 402, 31 P.3d 915 (2001); *In re Genesys*, 95 Hawai'i at 37 n. 4, 18 P.3d at 899 n. 4; *Matson Navigation Co. v. Federal Deposit Ins. Corp.*, 81 Hawai'i 270, 916 P.2d 680 (1996); *Cooper v. Smith*, 70 Haw. 449, 776

P.2d 1178 (1989). However, HRCP Rule 60(b) specifically allows for collateral proceedings when there is an allegation of fraud upon the court, stating, "This rule does not limit the power of a court to entertain an *independent action* to relieve a party from a judgment, order, or proceeding, or to set aside a judgment for fraud upon the court." (Emphasis added.) Thus, like the policy favoring the finality of judgments, the policy against collateral attacks on judgments is not absolute and does not favor limiting liability in a collateral proceeding when there is an allegation that fraud was committed in the prior proceeding.

### f. *promoting zealous advocacy*

The ICA has noted that one purpose of the litigation privilege is to force the parties to present their best arguments at trial, stating:

> The absolute privilege is grounded on the important public policy of "securing to attorneys as officers of the court the utmost freedom in their efforts to secure justice for their clients." Restatement § 586 comment a. Thus, it not only protects attorneys in the pursuit of their profession, but also ensures the public's right to zealous legal representation. Counterbalancing this, however, is the equally important public policy of protecting individuals from defamatory statements which are unrelated to the judicial proceeding involved.

*McCarthy*, 5 Haw.App. at 48, 678 P.2d at 14. Similarly, the California Supreme Court has stated that the litigation privilege "promotes the effectiveness of judicial proceedings by encouraging attorneys to zealously protect their clients' interests." *Silberg*, 266 Cal. Rptr. 638, 786 P.2d at 370. "Just as participants in litigation must be free to engage in unhindered communication, so too must those participants be free to use their best judgment in prosecuting or defending a lawsuit without fear of having to defend their actions in a subsequent civil action for misconduct." *Levin*, 639 So.2d at 608.

This court has stated that "zealous advocacy is a necessary component of our judicial system." *Breiner*, 89 Hawai'i at 171, 969 P.2d at 1289; *see also In re Attorney's Fees*

*of Mohr*, 97 Hawai'i 1, 7, 32 P.3d 647, 653 (2001) (noting the policy of this court not to sanction court-appointed attorneys if their arguments on appeal reflect zealous advocacy on behalf of their clients). However, as the ICA has noted, "there are limits to how far an attorney should go in representing a client; there is also a requirement that clients be zealously represented 'within the bounds of the law.'" *Myers*, 5 Haw.App. at 246, 687 P.2d at 16 (citing *Giuliani v. Chuck*, 1 Haw.App. 379, 384, 620 P.2d 733, 737 (1980)). Accordingly, even cases upholding the litigation privilege circumscribe its application. For example, the ICA has noted that the purpose of the litigation privilege was to allow attorneys freedom in their efforts "to secure justice" for their clients. *McCarthy*, 5 Haw.App. at 48, 678 P.2d at 14. Similarly, the Florida Supreme Court stated that the privilege was intended to allow parties the use of their "best judgment" in pursuing their claims. *Levin*, 639 So.2d at 608. Litigation misconduct that amounts to a fraud on the court directly conflicts with the pursuit of justice and never results from a reasonable advocate's best judgment. Thus, the policy of promoting zealous advocacy is counterbalanced by the need to adequately punish and discourage such misconduct. Consequently, the policy of promoting zealous advocacy does not favor limiting liability in subsequent collateral proceedings for fraud.

### g. *discouraging abusive litigation practices*

The Matsuuras argue that this court should allow the defendants to be held liable for fraud in a subsequent, collateral action to dissuade abusive litigation practices. Other jurisdictions have noted that other established remedies, including court sanctions, contempt proceedings, criminal prosecutions, and disciplinary actions against attorneys already serve to discourage litigation misconduct. *See Florida Evergreen I*, 135 F.Supp.2d at 1283 (citations omitted); *Levin*, 639 So.2d at 608; *Silberg*, 266 Cal.Rptr. 638, 786 P.2d at 370–71. Thus, we must examine the efficacy of established remedies for litigation misconduct and the benefits of allowing a subsequent, collateral proceeding for fraud.

Criminal contempt, attorney discipline, and criminal prosecution deter the type of litigation misconduct alleged in the instant case. However, none of these remedies compensate the victims of such misconduct. Criminal contempt is used "to punish past defiance of a court's judicial authority, thereby *vindicating the court.*" *LeMay v. Leander,* 92 Hawai'i 614, 621, 994 P.2d 546, 553 (2000) (emphasis added) (citation omitted). Regarding attorney discipline, this court has stated that disciplinary proceedings do "not provide a means of redress for one complaining to have been personally wronged by an attorney." *Akinaka v. Disciplinary Bd. of the Hawai'i Supreme Court,* 91 Hawai'i 51, 59, 979 P.2d 1077, 1085 (1999) (citation and internal quotation marks omitted). Similarly, the principal goals of the penal system, as declared by our legislature in 1986, are deterrence and punishment. *State v. Medeiros,* 89 Hawai'i 361, 369, 973 P.2d 736, 744 (1999) (citing Sen. Conf. Comm. Rep. No. 51–86, in 1986 Senate Journal, at 748). Thus, although criminal contempt, attorney discipline, and criminal prosecution deter and punish the kind of misconduct alleged in the instant case, the primary goal of these procedures is not to compensate parties injured by such misconduct.

■ On the other hand, procedures exist to compensate parties for litigation misconduct. A civil contempt proceeding allows parties to pursue compensation for litigation misconduct. As this court has noted, in a civil contempt proceeding, "the sanction is wholly remedial, serves only the purposes of the complainant, and is not intended as a deterrent to offenses against the public." *LeMay,* 92 Hawai'i at 621, 994 P.2d at 553 (citation omitted). However, to maintain a successful claim of civil contempt,

> a movant must establish that: (1) the order with which the contemnor failed to comply is clear and unambiguous; (2) the proof of non-compliance is clear and convincing; and (3) the contemnor has not diligently attempted to comply in a reasonable manner.

*LeMay,* 92 Hawai'i at 625, 994 P.2d at 557 (citation omitted). We note that, but for the fact that the circuit court entered specific discovery orders in this case, the principal allegations of fraudulent conduct could not have been addressed through a civil contempt proceeding. Thus, the requirement of a clear and unambiguous court order limits the utility of civil contempt as a means of compensating parties injured by fraud committed during prior litigation proceedings.

■ The HRCP also provide a means to compensate parties for injuries suffered from litigation misconduct. A successful motion under HRCP Rule 60(b) allows parties to vacate a judgment procured through fraud and to pursue compensation that is consistent with the true value of their claims. Additionally, upon successfully reopening a case through an HRCP Rule 60(b) proceeding, aggrieved parties may pursue appropriate sanctions in the course of relitigating their claim. *See Virgin Islands Hous. Auth. v. David,* 823 F.2d 764, 767 (3d Cir.1987). Moreover, based upon the egregious nature of DuPont's fraud in the *Kawamata Farms* case, this court construed HRCP Rule 60(b)(3) to allow an award of attorneys' fees and costs as affirmative relief in addition to the relief afforded in the prior order or judgment. *Kawamata Farms,* 86 Hawai'i at 259, 948 P.2d at 1100 ("Under the circumstances of this case, based on the egregious nature of DuPont's fraud, we construe the HRCP so as not to disallow a remedy under HRCP Rule 60(b)(3) when there is a post-judgment discovery of fraud supported by clear and convincing evidence."). Thus, the HRCP provide a means for parties to receive compensation resulting from litigation misconduct.

Although both civil contempt and HRCP Rule 60(b) provide remedies to a party aggrieved by litigation misconduct, we believe that the existence of these remedies does not oblige us to limit victims of fraud solely to these established remedies, given the nature and effect of fraud.

### h. *encouraging settlement*

DuPont argues that preventing a party from being held liable in a subsequent, collateral proceeding for litigation conduct, including fraud, encourages settlement. Quoting *Amantiad v. Odum,* 90 Hawai'i 152, 161–62,

977 P.2d 160, 169–71 (1999), in support of its argument, DuPont states:

> We acknowledge the well-settled rule that the law favors the resolution of controversies through compromise or settlement rather than by litigation. Such alternative to court litigation not only brings finality to the uncertainties of the parties, but is consistent with this court's policy to foster amicable, efficient, and inexpensive resolutions of disputes. In turn, it is advantageous to judicial administration and thus to government and its citizens as a whole. We agree with the policy and law of settlements which the Supreme Court of Arkansas succinctly sets forth in *Ragland v. Davis,* 301 Ark. 102, 106–107, 782 S.W.2d 560, 562 (1990) (citation omitted):
>
> Courts should, and do, so far as they can do so legally and properly, support agreements which have for their object the amicable settlements of doubtful rights by parties; the consideration for such agreements is not only valuable, but highly meritorious. Because they promote peace, voluntary settlements ... must stand and be enforced if intended by the parties to be final, notwithstanding the settlement made might not be that which the court would have decreed if the controversy had been brought before it for decision. Such agreements are binding without regard to which party gets the best of the bargain or whether all the gain is in fact on one side and all the sacrifice on the other.
>
> * * *
>
> The Washington Supreme Court said it even more tersely: "The law favors settlements and consequently it must favor their finality."

However, from within the excerpt cited, DuPont omits this court's highlighted statement: " '*It is an elemental rule that the law favors compromise and settlement of disputes and generally, in the absence of bad faith or fraud, when parties enter into an agreement settling and adjusting a dispute, neither party is permitted to repudiate it.*' " *Amantiad,* 90 Hawai'i at 162, 977 P.2d at 170 (italics in original) (underscored emphasis added) (quoting *Matter of Estates of Thomp-*

*son,* 226 Kan. 437, 601 P.2d 1105, 1108 (1979)). Indeed, the portion of this court's opinion omitted by DuPont clearly articulates the law's disapproval of settlements obtained through fraud. Further, as the Ninth Circuit has noted:

> Insistence on the finality of settlements is based on the assumption that the parties have freely bargained to exchange the costs, risks and potential rewards of litigation for the certainty of a settlement that seems fair in light of facts known at the time. Settlements induced by fraud are set aside however, because the defrauded party has not freely bargained but has been induced to settle by affirmative misrepresentations by the other party. Enforcing such a settlement would undermine the policy of encouraging voluntary settlement of disputes: if litigants cannot assume the disclosures and representations of the opposing party are made in good faith, they will be reluctant to settle.

*Matsuura,* 166 F.3d at 1012. Settlement is the voluntary relinquishment of the right to a determination by a court of law. Thus, encouraging parties to forego the protections associated with a trial requires adequate assurance that appropriate remedies exist for settlements reached through bad faith and misconduct. Accordingly, the policy of encouraging settlements does not favor limiting liability for fraud engaged in during prior litigation proceedings.

In sum, of the eight policies underlying the litigation privilege, the policy of avoiding the chilling effect resulting from the threat of subsequent litigation clearly favors limiting liability in subsequent proceedings. However, the remaining policies of: promoting the candid, objective, and undistorted disclosure of evidence; placing the burden of testing the evidence upon the litigants during trial; reinforcing the finality of judgments; limiting collateral attacks on judgments; promoting zealous advocacy; discouraging abusive litigation practices; and encouraging settlement do not. With the aforementioned policies in mind, we now address the first certified question presented.

**162**

## 2. Analysis

The first question by the district court asks whether a party can be held liable for civil damages based upon misconduct engaged in during prior litigation proceedings. Initially, as noted *supra*, existing remedies, such as a motion under HRCP Rule 60(b), contempt proceedings, and sanctions allow parties to be held liable for civil damages based upon litigation misconduct. However, the question by the district court requires this court to consider whether Hawai'i law allows a party to be held liable for litigation misconduct in a collateral proceeding such as the instant case.

██ The history of the present case demonstrates how collateral proceedings burden court resources and protract litigation. However, given (1) the courts' objective of uncovering truth, (2) the injurious effect of fraud on the ability to test the evidence presented, (3) the preference for judgments on the merits, (4) this court's duty to discourage abusive litigation practices, and (5) the desire to encourage settlement, we conclude that the interests in (a) avoiding the chilling effect of collateral litigation, (b) reinforcing the finality of judgments, and (c) limiting collateral attacks on judgments are outweighed when fraud is alleged. Accordingly, based upon the foregoing discussion, we answer the first certified question as follows:

> Under Hawai'i law, a party is not immune from liability for civil damages based upon that party's fraud engaged in during prior litigation proceedings.

### B. *Fraudulent Inducement*

The second question asks:

> Where plaintiffs' attorneys and others have accused the defendant of fraud and dishonesty during the course of prior, related litigation, are plaintiffs thereafter precluded as a matter of law from bringing a cause of action for fraudulent inducement to settle because they should not have relied on the defendant's representations?

Dupont argues that Hawai'i law on fraudulent inducement requires that the plaintiff's reliance be reasonable and that this court should follow other jurisdictions that hold as a matter of law that, when a plaintiff settles claims involving allegations of fraud or dishonesty against opposing counsel, the plaintiff cannot subsequently claim that his reliance upon the opposing party's representations was reasonable.[18] Based on the pleadings, DuPont alleges that the Matsuuras joined in and monitored allegations that DuPont had engaged in fraudulent and dishonest conduct in the underlying litigation and that the allegations of misconduct in the current case are identical to those raised in the underlying litigation. Thus, according to DuPont, the Matsuuras could not, as a matter of law, have reasonably relied upon DuPont's representations. Further, DuPont argues that the Matsuuras should have demanded express written warranties or representations as to any matters they considered critical to their decision to settle.

The Matsuuras contend that Hawai'i law only requires actual reliance regardless of its reasonableness. In the alternative, the Matsuuras argue that, because the alleged fraud was perpetrated in the course of court proceedings, where court rules and rules of professional conduct apply, they had an "absolute right to rely" upon DuPont's representations and that their reliance on DuPont's discovery responses was reasonable *per se*. The Matsuuras also note that other jurisdictions have held that the mere existence of a distrustful relationship is not sufficient to preclude a finding of reasonable reliance.

### 1. The Elements of Fraudulent Inducement

██ Regarding the elements of fraudulent inducement, this court recently stated:

> To constitute fraudulent inducement sufficient to invalidate the terms of a contract,

18. DuPont cites, *inter alia*, *Mergens v. Dreyfoos*, 166 F.3d 1114 (11th Cir.), *cert. denied*, 528 U.S. 820, 120 S.Ct. 63, 145 L.Ed.2d 55 (1999); *Finn v. Prudential–Bache Securities, Inc.*, 821 F.2d 581, 586 (11th Cir.1987); *Pettinelli v. Danzig*, 722 F.2d 706 (11th Cir.1984); *Metrocall of Delaware, Inc. v. Continental Cellular Corp.*, 246 Va. 365, 437 S.E.2d 189 (1993); *Florida Evergreen I, supra.*

there must be (1) a representation of a material fact, (2) made for the purpose of inducing the other party to act, (3) known to be false but reasonably believed true by the other party, and (4) upon which the other party relies and acts to [his or her] damage.

*Hawaii Community Federal Credit Union v. Keka,* 94 Hawai'i 213, 230, 11 P.3d 1, 18 (2000) (quoting *Pancakes of Hawai'i, Inc. v. Pomare Properties Corp.,* 85 Hawai'i 300, 312, 944 P.2d 97, 109 (App.1997) (other citations omitted).... Put similarly, "[t]he general rule is that '[i]f a party's misrepresentation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient.'" *Park v. Government Employees Ins. Co.,* 89 Hawai'i 394, 399, 974 P.2d 34, 39 (1999) (quoting *Restatement (Second) of Contracts* § 164(1) (1979)).

*Fujimoto v. Au,* 95 Hawai'i 116, 157, 19 P.3d 699, 740 (2001). However, we recognize that our case law has not always required that reliance be reasonable. *See, e.g. Shoppe v. Gucci Am. Inc.,* 94 Hawai'i 368, 386, 14 P.3d 1049, 1067 (2000) (listing the elements of fraud as (1) false representations were made by defendants, (2) with knowledge of their falsity (or without knowledge of their truth or falsity), (3) in contemplation of plaintiff's reliance upon these false representations, and (4) actual reliance by the plaintiff) (citations omitted). Thus, we take this opportunity to clarify that, under Hawai'i law, to prevail on a claim of fraudulent inducement, plaintiffs must prove that their reliance upon a defendant's representations was reasonable.

**2. Reasonable Reliance**

■ "As a general principle ... the question of whether one has acted reasonably under the circumstances is for the trier of fact to determine." *Richardson v. Sport Shinko (Waikiki Corp.),* 76 Hawai'i 494, 503, 880 P.2d 169, 178 (1994) (citing *Knodle v. Waikiki Gateway Hotel, Inc.,* 69 Haw. 376, 387, 742 P.2d 377, 384 (1987); *Bidar v. Amfac, Inc.,* 66 Haw. 547, 552–53, 669 P.2d 154, 159 (1983)). Additionally, this court has ac-

knowledged "the accepted principle that[,] where reasonable minds might differ as to the reasonableness of plaintiff's conduct, the question is for the jury." *Young v. Price,* 47 Haw. 309, 317 n. 10, 388 P.2d 203, 208 n. 10 (1963). Thus, the answer to the second certified question hinges on whether reasonable minds could differ as to the reasonableness of the Matsuuras' reliance upon the representations by DuPont, in spite of their previous accusations of fraud and dishonest conduct.

*a. prior allegations of fraud*

This court has stated:

Where it appears that one party has been guilty of an intentional and deliberate fraud, by which, to his knowledge, the other party has been misled, or influenced in his action, he cannot escape the legal consequences of his fraudulent conduct by saying that the fraud might have been discovered had the party whom he deceived exercised reasonable diligence and care.

*Kang v. Harrington,* 59 Haw. 652, 659, 587 P.2d 285, 290 (1978) (quoting *Cummins v. Cummins,* 24 Haw. 116, 122 (1917)). However, in *Kang,* the plaintiffs were only required to prove actual, as opposed to reasonable, reliance. *Kang,* 59 Haw. at 656, 587 P.2d at 289. Other jurisdictions differ as to whether prior allegations of fraud preclude a finding of reasonable reliance. Decisions based upon Florida law indicate that when the parties have been in an adversarial relationship and the plaintiff has made prior allegations of fraud, plaintiffs could not subsequently rely upon the defendant's representations. *Mergens,* 166 F.3d at 1118; *Finn,* 821 F.2d at 586; *Pettinelli,* 722 F.2d at 710. The apparent bright-line rule established in these cases do "not recognize an exception to the justifiable reliance rule where the plaintiff's investigations were frustrated or thwarted by the defendant's conduct." *Florida Evergreen I,* 135 F.Supp.2d at 1295. The United States Courts of Appeal for the Second Circuit and the Virginia Supreme Court similarly hold that prior allegations of fraud against a defendant preclude subsequent reasonable reliance upon the defendant's representations.

*Finz v. Schlesinger*, 957 F.2d 78 (2d Cir.), *cert. denied*, 506 U.S. 822, 113 S.Ct. 72, 121 L.Ed.2d 38 (1992); *Metrocall of Delaware, Inc. v. Continental Cellular Corp.*, 246 Va. 365, 437 S.E.2d 189 (1993).

The rule precluding a finding of reasonable reliance when there have been prior allegations of fraud is not universal. The Illinois Appellate Court recognized the rule followed in Florida and Virginia, but nevertheless stated:

> This court is reluctant to pronounce a broad rule of law whereby parties, accused of myriad types of fraud and dishonesty, are set loose to live up to the allegations leveled against them while attempting to settle the original dispute. The likely effect of such a rule would be to encourage dishonesty and to drastically reduce the willingness of plaintiffs to settle their fraud claims, because plaintiffs could never hold defendants accountable for any misrepresentations of fact made during settlement negotiations.

*Sims v. Tezak*, 296 Ill.App.3d 503, 230 Ill. Dec. 737, 694 N.E.2d 1015, 1020, *reh'g denied*, 296 Ill.App.3d 503, 230 Ill.Dec. 737, 694 N.E.2d 1015, *appeal denied*, 179 Ill.2d 619, 235 Ill.Dec. 576, 705 N.E.2d 449 (1998). Similarly, the United States Court of Appeals for the Eleventh Circuit, applying Colorado law, held that "a party is not categorically barred from relying on the representations of the opposing party when negotiating the settlement of a dispute which involves a claim for fraud." *Chase*, 875 F.2d at 283.[19] The court explained:

> The public routinely negotiates the settlement of disputes in reliance upon the representations of the other party. While every dispute is "adversarial" to some degree, the parties must have some assurance of legal recourse if they are induced to settle the dispute on the basis of false representations of material facts. To hold otherwise would discourage parties from settling their disputes out of court. This is

true regardless of whether or not the underlying dispute involves an allegation of fraud.

*Chase*, 875 F.2d at 283.

The different holdings of other jurisdictions suggest that reasonable minds indeed differ on this issue. More persuasively, however, the other jurisdictions that have addressed this issue have based their conclusions of law upon a more complete factual record than that presented to this court. Based upon the limited record in the present case, we are reluctant to establish a broad holding foreclosing future, potentially meritorious claims.

### b. *representations by attorneys*

The Matsuuras argue that their reliance upon DuPont's representations was reasonable because such representations were made through DuPont's attorneys. This court has stated: "The practice of law is an honorable profession that requires its practitioners to behave in accordance with high ethical standards, including compliance with court rules and orders." *Office of Disciplinary Counsel v. Lau*, 79 Hawai'i 201, 207, 900 P.2d 777, 783 (1995). The Hawai'i Rules of Professional Conduct (HRPC) outline an attorney's ethical and professional responsibilities and specifically forbid the type of misrepresentations alleged by the Matsuuras. The HRPC provide, *inter alia:* "A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent," HRPC Rule 1.2(d) (2001); "A lawyer shall reveal information which clearly establishes a criminal or fraudulent act of the client in the furtherance of which the lawyer's services has been used, to the extent reasonably necessary to rectify the consequences of such act, where the act has resulted in substantial injury to the financial interest or property of another," HRPC Rule 1.6(b) (2001); "A lawyer shall not knowingly make a false statement of material fact or

---

**19.** *Florida Evergreen I*, which presents a virtually identical factual situation to that before this court, held that *Chase* was distinguishable because the underlying fraud was "similar in type to the fraudulent inducement claims that are currently before the Court, and Plaintiffs also had knowledge of similar types of conduct in other related lawsuits. Furthermore, the parties were in an extremely adversarial position when the settlement agreement was signed and executed in this case." *Florida Evergreen I*, 135 F.Supp.2d at 1297.

law to a tribunal," HRPC Rule 3.3(a)(1) (2001); "A lawyer shall not fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client," HRPC Rule 3.3(a)(2) (2001); "A lawyer shall not unlawfully obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value. A lawyer shall not counsel or assist another person to do any such act," HRPC Rule 3.4(a) (2001). Moreover, "[c]ourts presume that attorneys abide by their professional responsibilities." *Associates Fin. Servs. Co. of Hawai'i, Inc. v. Mijo*, 87 Hawai'i 19, 31, 950 P.2d 1219, 1221 (1998). The courts' presumption that attorneys will not make false representations before them suggests that a similar assumption on the part of opposing counsel and adverse parties is a reasonable one.

■ Hawai'i law establishes, however, that reliance upon representations of an attorney is not *per se* reasonable or justified. Although noting that "an attorney should be justified in relying upon the statements of another attorney because attorneys are prohibited from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation," the ICA held that the parties were not justified in relying upon opposing counsel's settlement representations because Hawai'i Revised Statutes (HRS) § 605-7 provides that attorneys have no authority to settle without special authority in writing. *Cook v. Surety Life Ins. Co.*, 79 Hawai'i 403, 412, 903 P.2d 708, 717 (App.1995) (citation, internal quotation marks, brackets, and emphasis omitted). Thus, the ICA determined that, in spite of the ethical duties placed upon attorneys, the facts of the case before it, including the requirements of HRS § 605-7, indicated that reliance upon the attorney's representations was not reasonable under the circumstances. In the present case, however, there is no clear statutory or other authority indicating that reliance upon the representations was unreasonable as a matter of law.

c. *discovery responses*

The Matsuuras argue that their reliance upon DuPont's representations was reason-able because the representations were made in response to discovery requests. The HRCP, like its federal counterpart, "reflect a basic philosophy that a party to a civil action should be entitled to the disclosure of all relevant information in the possession of another person prior to trial, unless the information is privileged." *Wakabayashi v. Hertz*, 66 Haw. 265, 275, 660 P.2d 1309, 1315 (1983) (citations omitted). Based upon the same basic policy of open disclosure recognized by this court, federal courts have held that parties are justified in relying upon discovery responses. This court has stated that federal courts' interpretations of the Federal Rules of Civil Procedure are deemed highly persuasive, albeit not conclusive, upon this court's interpretations of the HRCP. *Kawamata Farms*, 86 Hawai'i at 256, 948 P.2d at 1097.

In *Rozier*, the widow of a passenger killed as a result of an alleged negligently designed automobile fuel tank unsuccessfully moved for a new trial pursuant to FRCP Rule 60(b)(3). *Rozier*, 573 F.2d at 1337. In holding that the trial court abused its discretion in denying the plaintiff's motion, the United States Court of Appeals for the Fifth Circuit noted:

> Our system of civil litigation cannot function if parties, in violation of court orders, suppress information called for upon discovery. "Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession." The Federal Rules of Civil Procedure substitute the discovery process for the earlier and inadequate reliance on pleadings for notice-giving, issue-formulation, and fact-revelation. As the Supreme Court stated in *Hickman v. Taylor*, [329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947) ], "civil trials in the federal courts no longer need be carried on in the dark. The way is now clear, consistent with recognized privileges, for the parties to obtain the fullest possible knowledge of the issues and facts before trial." *The aim of these liberal discovery rules is to "make a trial less a game of blind man's bluff and more*

*a fair contest with the basic issues and facts disclosed to the fullest practicable extent." It is axiomatic that "(d)iscovery by interrogatory requires candor in responding."*

*Rozier,* 573 F.2d at 1345–46 (citations omitted) (emphases added). Agreeing with the policy considerations enunciated by the court in *Rozier,* the United States Court of Appeals for the Third Circuit held that one may reasonably rely upon an opposing party's responses to interrogatories, noting:

The Federal Rules themselves recognize the reliance aspect of discovery, permitting parties to request information inadmissible at trial where such request is "reasonably calculated to lead to the discovery of admissible evidence." *See* Fed.R.Civ.P. 26(b)(1). *Discovery could not serve the function of triggering subsequent inquiry if parties were not entitled to rely on the results obtained at each step. See Rozier,* 573 F.2d at 1345 ("Our system of civil litigation cannot function if parties ... suppress information called for upon discovery.").

*Averbach v. Rival Mfg. Co.,* 879 F.2d 1196, 1201 (3rd Cir.), *reh'g denied,* 879 F.2d 1196 (1989), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 726, 107 L.Ed.2d 745 (1990) (emphasis added). The court in *Averbach* concluded that, "[b]ecause the Federal Rules of Civil Procedure are structured to elicit truthful answers given under oath, the opposing party, in circumstances such as presented here, may reasonably rely on interrogatory answers." *Averbach,* 879 F.2d at 1201. However, the Third Circuit specifically limited its decision to the circumstances presented, specifically declining to hold that justifiable reliance can always be inferred from sworn answers to discovery requests. *Averbach,* 879 F.2d at 1200. Holding that parties may reasonably rely upon an opposing party's responses to discovery requests is consistent with the policy of liberal discovery established in both the HRCP and the federal rules.

### 3. Analysis

■ As noted *supra,* generally, whether one has acted reasonably under the circumstances is for the trier of fact to determine. Considering the policies raised and the arguments advanced by the parties, we are persuaded that reasonable minds could differ as to the reasonableness of the Matsuuras' reliance upon DuPont's representations. Therefore, we submit the following answer to the second certified question:

In an action for fraudulent inducement where plaintiffs' attorneys and others have accused the defendant of fraud and dishonesty during the course of prior dealings, plaintiffs are not precluded as a matter of law from establishing that their reliance on the defendant's representations was reasonable.

### C. Intentional and or Negligent Spoliation of Evidence

The final certified question asks:

Does Hawai'i law recognize a civil cause of action for damages for intentional and/or negligent spoliation of evidence?

Initially, the Matsuuras allege that conduct by DuPont constitutes spoliation of evidence. Accordingly, we limit our examination of this issue to allegations of spoliation of evidence by a party to the underlying litigation. We expressly omit discussion or analysis of spoliation by a third party.

### 1. Elements of the Tort

The few jurisdictions that recognize a cause of action for intentional spoliation (as opposed to negligent spoliation, discussed *infra*) of evidence require a showing of the following elements: (1) the existence of a potential lawsuit; (2) the defendant's knowledge of the potential lawsuit; (3) the intentional destruction of evidence designed to disrupt or defeat the potential lawsuit; (4) disruption of the potential lawsuit; (5) a causal relationship between the act of spoliation and the inability to prove the lawsuit; and (6) damages. *Oliver v. Stimson Lumber Co.,* 297 Mont. 336, 993 P.2d 11, 22 (1999); *Drawl v. Cornicelli,* 124 Ohio App.3d 562, 706 N.E.2d 849, 851 (1997); *Torres v. El Paso Electric Co.,* 127 N.M. 729, 987 P.2d 386, 401 (1999).

For a claim of negligent spoliation of evidence, jurisdictions generally require that

the plaintiff prove: (1) the existence of a potential civil action; (2) a legal or contractual duty to preserve evidence that is relevant to the potential civil action; (3) destruction of that evidence; (4) significant impairment in the ability to prove the lawsuit; (5) a causal relationship between the destruction of evidence and the inability to prove the lawsuit, and (6) damages. *Continental Ins. Co. v. Herman,* 576 So.2d 313, 315 (Fla.App.1990), *reh'g denied,* 598 So.2d 76 (Fla.1991); *Oliver,* 993 P.2d at 19.

## 2. The Matsuuras' Spoliation Claim

DuPont contends that this is not a proper case to consider adopting an independent tort for spoliation of evidence because the Matsuuras have failed to plead and cannot prove a causal relationship between the destruction of evidence and an inability to prove their lawsuit. The Matsuuras' claims are virtually identical to the claims made by the plaintiffs in *Florida Evergreen Foliage v. E.I. Du Pont De Nemours and Co.,* 165 F.Supp.2d 1345, 1359–61 (S.D.Fla.2001) [hereinafter, *Florida Evergreen II* ], wherein the federal district court held that the plaintiffs in that case could not satisfy the elements of a spoliation claim because the relevant data had not been destroyed and the destruction of the actual plants used in the Costa Rica study did not significantly impair or render the plaintiffs unable to prove their claims. *Florida Evergreen II,* 165 F.Supp.2d at 1359–61.

██ In reviewing the adequacy of a complaint, we deem the allegations contained within it to be true and examine whether "it appears beyond doubt that the plaintiff can prove no set of facts in support of his or her claim that would entitle him or her to relief." *Blair v. Ing,* 95 Hawaiʻi 247, 252, 21 P.3d 452, 457 (2001) (quoting *Baehr v. Lewin,* 74 Haw. 530, 545, 852 P.2d 44, 53 (1993) (internal citations omitted)).

██ As indicated *supra,* both intentional and negligent spoliation of evidence require: (1) the destruction of evidence;[20] (2) the disruption or significant impairment of the

lawsuit; and (3) a causal relationship between the destruction of evidence and the inability to prove the lawsuit. The Matsuuras' complaint includes the following allegations:

186. In addition to illegally withholding the laboratory data referred to above, DUPONT also illegally withheld documents and information regarding testing it had conducted in the field in Costa Rica in 1992. . . .

. . . .

209. Despite the facts of the test, the existence of data confirming the tests and the evidence proving Benlate caused plant damage, DUPONT never produced these documents in *Bush Ranch, Kawamata/Tomono* or any of the MALONE cases, including Plaintiffs', nor were they ever identified in any privilege log, nor were they revealed in sworn testimony by any DUPONT employees who were specifically asked about such tests during discovery. . . .

210. When the Costa Rica test was uncovered in 1996 in connection with the *Davis Tree Farms, Inc. v. DUPONT* case filed in Florida, and the deposition of Mr. Cefalo[21] was scheduled, DUPONT went to Costa Rica and attempted to intimidate and/or impede his testimony, in violation of 18 U.S.C. Sections 1503 and 1512.

211. In that case, DUPONT admitted it had waived any work product objection with respect to the 1992 test documents and yet obstructed discovery and refused to produce them even in the face of a court order compelling it to do so and even under threat of a default order. . . .

. . . .

214. In the *Davis Tree Farms* case and all cases previous to it, including Plaintiffs' cases, DUPONT intentionally withheld this crucial information re: the Costa Rica field test conducted in 1992, and denied its existence in an effort to prevent the disclosure to the Plaintiffs and the Court. . . .

215. Once the Costa Rica test was uncovered, DUPONT, in a last ditch effort,

---

20. The Matsuuras' complaint alleges that plants from the Costa Rica field test were destroyed.

21. According to the pleadings, Cefalo conducted the Costa Rica field test.

mislabeled and concealed the secrecy agreement and the contract with Welker Plants, Inc., on the privilege log. This conduct violated 18 U.S.C. Sections 1503 and 1512.

. . . .

217. DUPONT concealed the Costa Rica test and the documents and evidence associated with it in many other Benlate cases, including *Bush Ranch*, *Kawamata/Tomono*, Plaintiffs' cases and the other MALONE cases. . . . Such concealment was in violation of 18 U.S.C. Section 1503.

. . . .

219. DUPONT's fraudulent concealment of the Costa Rica testing was in part intended to and did in fact prevent Plaintiffs herein from discovering the fraud DUPONT had perpetrated on them and was meant to and did prevent them from seeking redress for such redress in a timely manner.

. . . .

222. MALONE on behalf of his clients, including Plaintiffs, had requested the production of documents and information, pursuant to which DUPONT should have produced the ALTA SU documents, the other lab testing revealing contamination of Benlate and the Costa Rica field test documents. With the exception of a small amount of the other lab contamination testing, none of the above-referenced information was disclosed or provided to MALONE by DUPONT.

223. The above-referenced evidence was damaging to DUPONT, very helpful to Plaintiffs and would clearly have enhanced their cases

224. As a result of the fact that DUPONT illegally concealed and lied about the above-referenced evidence and because of the effect of the concealment, Plaintiffs settled their cases for far less than their actual losses and the fair settlement value of their cases.

Thus, according to the Matsuuras' complaint, documents and information from the Costa Rica field test proved that Benlate damaged plants. This documentation was not destroyed and was, ultimately, disclosed by DuPont.

In their underlying lawsuits, the Matsuuras alleged damages from the use of Benlate. Thus, in order to constitute a valid claim of spoliation of evidence, the Matsuuras must prove that the *destruction of the plants* from the Costa Rica field test resulted in their inability to prove that Benlate damaged their plants and fields. However, the Matsuuras indicate that documents and other information pertaining to the Costa Rica field test— including photos and videotape of the plants—demonstrated the harmful effects of Benlate. Additionally, the Matsuuras indicate that the Alta test results and the Keeler documents both indicated that Benlate was contaminated with herbicides. Moreover, the plaintiffs in *Kawamata Farms* were successful in proving substantially identical claims without the benefit of any evidence from the Costa Rica field test. Therefore, given that the Matsuuras' allegations indicate that evidence *other than the plants from the Costa Rica field test* demonstrated the harmful effects of Benlate, the destruction of the Costa Rica plants did not result in their inability to prove their suit.

Because the facts alleged cannot support their spoliation claim, this court need not resolve whether Hawai'i law would recognize a tort of spoliation of evidence. *Petrik v. Monarch Printing Corp.*, 150 Ill.App.3d 248, 103 Ill.Dec. 774, 501 N.E.2d 1312, 1321 (1986), *reh'g denied*, 150 Ill.App.3d 248, 103 Ill.Dec. 774, 501 N.E.2d 1312 (1987), *appeal denied*, 114 Ill.2d 556, 108 Ill.Dec. 424, 508 N.E.2d 735 (1987). Therefore, insofar as the third certified question does not appear to be "determinative of the cause," it was inappropriate for certification under HRAP Rule 13. Accordingly, we decline to answer it.

### III. *CONCLUSION*

Based on the foregoing, we answer the first certified question as follows: Under Hawai'i law, a party is not immune from liability for civil damages based upon that party's fraud engaged in during prior litigation proceedings. As to the second certified question, we answer: In an action for fraudulent inducement where plaintiffs' attorneys and others have accused the defendant of fraud

and dishonesty during the course of prior dealings, plaintiffs are not precluded as a matter of law from establishing that their reliance on the defendant's representations was reasonable. For the reasons discussed *supra*, we decline to answer the third certified question.

### Concurring and Dissenting Opinion by ACOBA, J.

In determining that (1) the policies of discouraging abusive litigation practices, encouraging settlement, reinforcing the finality of judgments, and limiting collateral attacks upon judgments, *see* majority opinion at 156–158, 158–160, 73 P.3d at 694–696, 696–698, militate against an extension of the litigation privilege,[1] and (2) as a result, Hawai'i law does allow a subsequent, independent action for fraud based upon litigation misconduct in a prior, related action, *see* majority opinion at 160–161, 73 P.3d at 698–699, the majority has adopted the position I had set forth as to certified questions one and two; therefore, I set out my position in detail.[2]

In my view, where matters relevant to prior litigation procedures were concealed to fraudulently induce settlement of a case, the injured party is entitled to bring an independent post-settlement action for fraud. This rule is consistent with recent decisions, reason, and policy. Accordingly, I would answer the first and second certified questions in the negative.[3]

As to the first certified question, I believe (1) four policy concerns underlying the litigation privilege favor affording Plaintiffs a separate action for fraud, (2) Hawai'i Rules of Civil Procedure (HRCP) Rule 60(b)(3) relating to fraud on the court should not govern the outcome of this case, (3) a separate action would not cause substantial delay and prolong litigation, and (4) a separate action to remedy fraudulent inducement perpetuated

---

1. This jurisdiction has recognized a litigation privilege in libel actions. In *Ferry v. Carlsmith*, 23 Haw. 589 (1917), this court adopted a litigation privilege and held that "attorneys, in the conduct of judicial proceedings, are privileged from prosecution for libel or slander in respect to words or writings, used in the course of such proceedings, ... when such words and writings are material and pertinent to the question involved." *Id.* at 591; *see also Abastillas v. Kekona*, 87 Hawai'i 446, 447, 958 P.2d 1136, 1137, (noting that the Intermediate Court of Appeals affirmed the circuit court's granting of summary judgment of a libel action against an attorney "in connection with his [prior] representation ... on the basis of absolute immunity"), *reconsideration denied*, (1998).

   Defendant E.I. du Pont de Nemours & Company argues that this court should expand its application of the litigation privilege to preclude a suit based upon litigation misconduct in a prior case. Following this reasoning, if the litigation privilege were to be applied in the instant case, this suit, which is based upon litigation misconduct that occurred in a prior suit, would be prohibited. Conversely, if the litigation privilege is held not to apply, a subsequent suit may proceed.

2. As a matter of policy, and with all due respect, when a separate position is already written, but later adopted by the majority, it would appear self-evident and of accepted practice that the separate opinion announce the majority opinion. Any other course only results in unnecessary delay as the majority incorporates the separate position into a new or previously written opinion. Inasmuch as the resulting delay, which can be substantial, impacts the parties and our disposition of cases, I cannot agree with a procedure that results in such delay. *Cf. State v. Yamada*, 99 Hawai'i 542, 557, 57 P.3d 467, 482, (Acoba, J., concurring) ("Inasmuch as the majority agrees with and has adopted my position that the court's Special Instruction No. 1 was erroneous, I set out my position in detail."), *reconsideration denied*, 100 Hawai'i 295, 59 P.3d 930 (2002); *State v. Faria*, 100 Hawai'i 383, 394–95, 60 P.3d 333, 344–45 (2002) (Acoba, J., Concurring in part with Ramil, J. and Dissenting to the decision of Moon, C.J.) ("Chief Justice Moon's opinion adopts and incorporates the initial position of Justice Ramil.... Inasmuch as Justice Ramil's position set forth the ultimate majority result, I believe his opinion should have announced the majority disposition in this case."); *State v. Enriquez*, No. 22023, 2002 WL 31873604, at *2 (Haw. Dec.20, 2002) (unpublished opinion) (Acoba, J., concurring) (stating that "inasmuch as the majority agrees with and has adopted this concurring opinion's rationale in reaching the majority's conclusion, I set out the facts and law that support the propositions the majority agrees with and has adopted"), *available at* http://www.state.hi.us/jud/22023con.htm.

3. As to the third certified question, in my view, inasmuch as Plaintiffs are entitled to an independent action for fraud, it is not necessary to address the third certified question. Evidence of spoilation, if produced at trial, may be addressed by a variety of trial devices such as appropriate instructions, striking of defenses, limitation of testimony, etc.

in a prior case, is supported by case law, reason, and policy. As to the second certified question, I disagree with the majority that a plaintiff must show reasonable reliance instead of actual reliance when proceeding in a cause of action for fraud. *See* majority opinion at 161–162, 73 P.3d at 699–700.

## I.

The first certified question asks: "Under Hawai'i law, is a party immune from liability for civil damages based on that party's misconduct, including fraud, engaged in during prior litigation proceedings?" There are eight policy concerns or criteria associated with the litigation privilege. It is posited that arguably four of the policies, that of discouraging abusive litigation practices, encouraging settlement, reinforcing the finality of judgments, and limiting collateral attacks upon judgments, weigh against, rather than for, an independent action for fraud as a remedy that Plaintiffs may invoke. In my view the four criteria do not weigh in favor of a litigation privilege but, instead, count in favor of recognizing an independent action for fraud.

First, as to the policy of discouraging abusive litigation practices, the contention that this factor favors application of the litigation privilege because there are already adequate criminal and civil remedies, including HRCP Rule 60(b) (2002),[4] to deter litigation misconduct would be wrong. Criminal law remedies are irrelevant to the compensatory and punitive damages sought by Plaintiffs. Civil law provisions appear largely inadequate as post-judgment remedies. *See* discussion *infra* section II. For, the alleged concealment of incriminating test results by Defendant were largely undiscovered by Plaintiffs until

well after Plaintiffs' claims had been terminated by settlement and Plaintiffs were no longer parties to the suit.

Second, the policy of encouraging settlements weighs not against, but heavily in favor of, permitting Plaintiffs to file an independent action. *See* discussion *infra* section IV, subsection C. Third, when judgments are tainted by fraud, the policy of reinforcing the finality of judgments is outweighed by this court's preference for judgments on the merits. *See generally Lesser v. Boughey,* 88 Hawai'i 260, 261, 965 P.2d 802, 803 (1998) (noting that "this court has a policy 'to permit litigants to appeal and to have their cases heard on the merits' " (quoting *O'Connor v. Diocese of Honolulu,* 77 Hawai'i 383, 385, 885 P.2d 361, 363, *reconsideration denied,* 77 Hawai'i 489, 889 P.2d 66 (1994)) (emphasis omitted)); *Long v. Long,* 101 Hawai'i 400, 405, 69 P.3d 528, 533 (App.2003) (noting "strong policy favoring resolution of cases on their merits"). Fourth, the strong policy against collateral attacks on judgments has never been absolute as evidenced by the fact that HRCP Rule 60(b)(3) specifically allows a judgment procured by fraud to be set aside. *See generally In re Genesys Data Techs., Inc.,* 95 Hawai'i 33, 37, 18 P.3d 895, 899 (2001) ("Pursuant to HRCP Rule 60(b)(3), 'on motion and upon such terms as are just, the court may relieve a party . . . from a final judgment . . . for . . . fraud[.]' " (Brackets omitted.)). Hence, this criterion, when fraud is alleged, weighs like the others, on the side of allowing an independent action to proceed.

## II.

In my opinion, HRCP Rule 60(b)(3) relating to fraud on the court would be an inadequate remedy in this case. In *Kawamata*

---

**4.** HRCP Rule 60(b) provides relief from a judgment or order and provides, in relevant part, as follows:

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); *(3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation,*

*or other misconduct of an adverse party;* (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken. . . . (Emphasis added.)

*Farms, Inc. v. United Agri Prods.*, 86 Hawai'i 214, 948 P.2d 1055 (1997), this court acknowledged that the parallel federal rule, Federal Rules of Civil Procedure Rule 60(b)(3), had limited application, having been interpreted by the federal courts as "available only to set aside a prior order or judgment; [and that] a court may not use Rule 60 to grant affirmative relief in addition to the relief contained in the prior order or judgment." *Id.* at 256, 948 P.2d at 1097 (citations and internal quotation marks omitted). The circuit court in *Kawamata Farms* had sanctioned defendant by, *inter alia*, awarding the other parties "additional attorneys' fees and costs incurred throughout the pretrial, trial, and post-trial proceedings relating to the misconduct that had not been previously been awarded as sanctions[.]" *Id.* at 257, 948 P.2d at 1098.

However, after considering the "egregious nature of the fraud by [defendant]," this court "construe[d] the HRCP so as not to disallow a remedy under HRCP Rule 60(b)(3) when there is a post-judgment discovery of fraud supported by clear and convincing evidence." *Id.* Thus, the circuit court's sanctions and award of attorneys' fees and costs were sustained because this court construed HRCP Rule 60(b)(3) "to allow for affirmative relief in th[at] case and because attorneys' fees and costs were allowed by" HRS §§ 603–21.9(1) and (6) (1993). *Id.* at 258, 948 P.2d at 1099. Nevertheless, HRCP Rule 60(b)(3) would not provide adequate recourse.

### A.

Under HRCP Rule 60(b)(3), the court may relieve a party from a final judgment, order, or proceeding for fraud. *See supra* note 4. If the only remedy available to Plaintiffs is to return to state court, to move to set aside the settlement agreement, and to reopen the case for fraud, Plaintiffs are faced with the HRCP Rule 60(b) requirement that such a "motion shall be made within a reasonable time, and for reasons (1), (2), and (3) *not*

*more than one year* after the judgment, order, or proceeding was entered or taken." (Emphasis added.)

In *Kawamata Farms*, the theory that the plaintiffs relied on for their HRCP 60(b)(3) motion is unclear. However, it is evident that this court affirmed the circuit court's allowance of affirmative relief under HRCP Rule 60(b)(3) based on "discovery fraud perpetuated *against the court.*" 86 Hawai'i at 257, 948 P.2d at 1098 (emphasis added). The one-year time limitation imposed on HRCP Rule 60(b)(3) [5] would not present an obstacle to relief in a motion based on fraud on the court. *See Schefke v. Reliable Collection Agency, Ltd.*, 96 Hawai'i 408, 431 n. 42, 32 P.3d 52, 75 n. 42 (2001) (stating that "courts place no time limit on setting aside a judgment on th[e] ground" of fraud on the court" (citations omitted)). But, fraud on the court is not fraud on a party, as is the gravamen of Plaintiffs' claim. *See id.* at 431, 32 P.3d at 75 ("[Fraud on the court] must be a direct assault on the integrity of the judicial process. Courts have required more than nondisclosure by a party or the party's attorney to find fraud on the court." (Citations and internal quotation marks omitted.)).

In the case at bar, fraud was allegedly committed against the parties. Hence, if HRCP Rule 60(b)(3) were to be applied, Plaintiffs would seem to be foreclosed from obtaining relief under HRCP Rule 60(b)(3) because the one-year limitation period has run.[6] Plaintiffs settled their case on April 26, 1994, and their claims were dismissed on November 23, 1994. More than two years later, on December 10, 1996, Plaintiffs filed their complaint for relief based on fraud. Inasmuch as Plaintiffs' complaint was filed more than one year after the settlement, Plaintiffs may be precluded from the dispensation afforded by HRCP Rule 60(b)(3). *See In re Genesys Data Techs., Inc.*, 95 Hawai'i at 37, 18 P.3d at 899 (noting that one-year limitation of HRCP Rule 60(b) barred plaintiff from seeking relief under HRCP Rule 60(b)(3) because plaintiff failed to timely re-

---

5. *See supra* note 4.

6. Defendant argued, in its reply brief, that "the one-year period [under HRCP Rule 60(b) ] runs

from the discovery of the facts giving rise to the request for relief from the judgment."

quest relief); *Dillingham Inv. Corp. v. Kunio Yokoyama Trust*, 8 Haw.App. 226, 235, 797 P.2d 1316, 1320 (1990) (holding that relief under HRCP Rule 60(b)(1), which is confined by the same statute of limitations as HRCP Rule 60(b)(3), was "unavailable to Appellants because they failed to file their motion within one year of the entry of the Judgment"). Because fraudulent concealment of discovery matters may not be discovered within one year, HRCP Rule 60(b)(3) is limited in scope and may preclude an otherwise just claim from recognition.

### B.

Additionally, *Kawamata Farms* only approved of affirmative relief as a limited modification of the reach of HRCP 60(b)(3). The remedies extended essentially to attorneys' fees and costs supported not only by HRCP Rule 60(b)(3), but by attorney's fees statutes. *Kawamata Farms* did not imply that compensatory and punitive damages might also be obtained under HRCP 60(b)(3) because this court further admonished that "the power to sanction a party for discovery misconduct is within the exclusive province of the circuit court, not the jury." 86 Hawai'i at 244, 948 P.2d at 1084. Thus, insofar as HRCP 60(b)(3) limits the parties to judicial sanctions, it would not provide adequate relief to Plaintiffs.

### C.

As mentioned, this court, in acknowledging the limited scope of HRCP Rule 60(b)(3), sanctioned affirmative relief in the form of attorney's fees and costs. Yet, in the present case, the parties would be entitled to a jury trial with respect to issues of fact, *i.e.*, fraud on Plaintiffs and of damages, *i.e.*, compensatory and punitive. *See Housing Fin. & Dev. Corp. v. Ferguson*, 91 Hawai'i 81, 90, 979 P.2d 1107, 1116 (1999) ("[J]uries in actions at law have historically determined issues of fact … and money damages in particular[.]" (Citations omitted.)); *State Farm Fire & Cas. Co. v. Pacific Rent–All, Inc.*, 90 Hawai'i 315, 327, 978 P.2d 753, 765, ("[Q]uestions of fact [are] for the determination of the jury." (Citations and internal marks omitted.)), *reconsideration denied*, 90 Hawai'i 315, 978

P.2d 753 (1999); *Watson v. Brown*, 67 Haw. 252, 258, 686 P.2d 12, 16 (1984) ("[Q]uestions of fact [are] for the jury to decide[.]"). Accordingly, HRCP 60(b)(3) would not provide an adequate basis for resolving the fraudulent conduct alleged.

### D.

Finally, if Plaintiffs were to pursue their remedies in federal court, Plaintiffs would be faced with the obstacle acknowledged by *Kawamata Farms*. That is, that federal courts do not afford affirmative relief under FRCP Rule 60(b)(3) of the kind awarded in *Kawamata Farms*, *i.e.*, attorney's fees and costs, much less an action for compensatory and punitive damages.

### III.

I also do not believe that a subsequent independent proceeding for fraudulent inducement would result in substantial delay and prolong litigation.

There is no dispute that neither Plaintiffs nor their attorney learned of Defendant's concealment of part of the Alta test results and all of the Costa Rica field study until 1997. Plaintiffs filed their initial complaint on December 10, 1996, and their first amended complaint on January 31, 1997. In 1997, the federal district court concluded that Plaintiffs' complaint was barred by their settlement agreements with Defendant. In 1998, Plaintiffs appealed to the Ninth Circuit. *See Matsuura v. Alston & Bird*, 166 F.3d 1006 (9th Cir.1999). On February 2, 1999, the Ninth Circuit reversed and remanded the case to the district court. On March 1, 2001, Plaintiffs moved to preclude Defendant from re-litigating the issues of fraud, discovery abuse, and intentional withholding of evidence in *Kawamata Farms* on the ground of collateral estoppel. On May 10, 2001, Defendant filed a motion requesting the district court to certify questions to this court. On June 18, 2001, the district court granted the motion. The present litigation has been ongoing since the discovery that information had been concealed.

Hence, there was no undue delay in the resolution of the present case. Based on the

allegations, whatever delay there was stems largely from Defendant's efforts to conceal the deception or fraud. Had Defendant acted in good faith in settling the case with Plaintiffs, the present litigation would not have found itself before this court some eight years after the settlement agreement. Taking Plaintiffs' allegations as true, delay was substantially attributable to Defendant's scheme to hide the incriminating evidence, and not to the proceedings brought to vindicate Plaintiffs' rights. Therefore, there is no justifiable reason for denying Plaintiffs the election of filing an independent action.

## IV.

In my view, allowing Plaintiffs the election to sue post-settlement in an independent action for fraud is supported by case law, reason, and policy.

### A.

In another Benlate case, the Delaware Supreme Court held that a party fraudulently induced to execute a release may file an independent suit as a remedy. *See E.I. Du-Pont de Nemours & Co. v. Florida Evergreen Foliage,* 744 A.2d 457, 458 (Del.1999), *rehearing denied* (2000) [hereinafter *Florida Evergreen II* ]. In *Florida Evergreen II,* as in this case, the plaintiffs entered into a settlement agreement in May 1994 with Defendant and executed a release. About four years later, on September 3, 1998, the plaintiffs filed an action for fraudulent inducement in the federal district court.

The plaintiffs alleged that Defendant implemented a fraudulent scheme to induce them to settle "for less than they would have otherwise ... insisted upon." *Id.* at 459. The alleged scheme consisted of fraud in withholding from discovery, material scientific data and information and giving false testimony in other Benlate cases. *See id.*

Similar to this case, the federal district court certified to the Delaware Supreme Court the question, " 'Under Delaware law, does the release in these settlement agreements bar Plaintiffs' fraudulent inducement claims?' " *Id.*

As it does in this case, Defendant asserted that an independent cause of action for settlement fraud based on prior litigation misconduct should not be allowed. *See id.* It maintained that "the only remedy for a fraudulently induced release is rescission with restoration of the proceeds of the settlement." *Id.* at 459–60. The Delaware Supreme Court disagreed and held that, in the "absence of a specific reference to the actionable fraud" in the release, the plaintiffs may elect an independent action for fraud. *Id.* at 462.

Objecting to the independent suit option, Defendant raised the same protest it raises here, *i.e.,* that such an option spawns "collateral litigation." *Id.* In response, the Delaware Supreme Court pointed out that a settlement agreement is in effect a contract, and that contract remedies allowed for rescission or an action for fraud. *See id.* at 463.

### B.

*Matsuura*[7] involved a federal appeal in this case. The allegations, as noted by the Ninth Circuit, were that Plaintiffs were fraudulently induced into settling with Defendant.[8] *See* 166 F.3d at 1007. The district court for the district of Hawai'i ruled that the settlement releases barred Plaintiffs from bringing suit. *See id.*

On appeal, the Ninth Circuit held that the releases did not bar an independent action alleging fraudulent inducement. *See id.* After analyzing the relevant Delaware case law,[9] the Ninth Circuit reversed the district court, holding that "parties who have been

7. The plaintiffs in *Matsuura v. Alston & Bird,* 166 F.3d 1006 (9th Cir.1999) are the same plaintiffs in the case at bar. DuPont and Alston & Bird, a law firm, are also named as defendants in *Matsuura.*

8. For consistency, although DuPont and Alston & Bird are defendants in the federal proceeding, "Defendant" hereinafter refers to the defendants

in the federal proceeding and Defendant in the case at bar, unless otherwise indicated.

9. Delaware law governs the *Matsuura* case because the releases signed by the plaintiffs and the defendant "provide that they are to be 'governed and construed' according to Delaware law." 166 F.3d at 1008 n. 3.

fraudulently induced to enter into a contract have a choice of remedies: they may rescind the contract or they may affirm the contract and sue for fraud." *Id.* at 1008. Also surveying decisions from other jurisdictions, the Ninth Circuit decided that "the weight of authority favors according defrauded tort plaintiffs an election of remedies." *Id.*

## C.

As in Delaware, settlement agreements in Hawai'i are viewed as contracts. *See e.g., State Farm Fire & Cas. Co.,* 90 Hawai'i at 323, 978 P.2d at 761 ("[A] settlement agreement is an agreement...." (Citations and internal quotation marks omitted.)). Any contract entered through fraud is vitiated as between the parties. *See Fujimoto v. Au,* 95 Hawai'i 116, 157, 19 P.3d 699, 740 ("Fraud vitiates all agreements as between the parties affected by it." (Quoting *Peine v. Murphy,* 46 Haw. 233, 239, 377 P.2d 708, 712 (1962). (Internal quotation marks and citation omitted.)), *reconsideration denied,* (2001).

In an action for fraudulent inducement, the plaintiff is entitled to rescission. *See Peine,* 46 Haw. at 239, 377 P.2d at 712 (holding that party "who was induced to enter into the joint adventure agreement by fraudulent representations ... may ... obtain a decree rescinding or cancelling the agreement *ab initio*" (italicized font in original)). It is basic contract law that a party may either rescind the contract or affirm the contract and bring a suit for damages. *See DiSabatino v. United States Fidelity & Guar. Co.,* 635 F.Supp. 350, 356 (D.Del.1986) (defrauded party may "rescind the contract or ... affirm it and sue for damages resulting from the fraudulent misrepresentation[ ]"); *Baeza v. Robert E. Lee Chrysler, Plymouth, Dodge, Inc.,* 279 S.C. 468, 309 S.E.2d 763, 766 (S.C.Ct.App.1983) (a party alleging fraudulent inducement may affirm the contract and sue for damages or rescind the contract); *Dallas Farm Machinery Co. v. Reaves,* 158 Tex. 1, 307 S.W.2d 233, 239 (1957) (a defrauded party may "stand to the bargain and recover damages for the fraud, or ... rescind the contract[ ]").

Hence, there is no reason for limiting the remedies available in post-settlement cases where fraud has induced the contract. *See Lemle v. Breeden,* 51 Haw. 426, 436, 462 P.2d 470, 475 (holding that remedies available for breach of contractual relationship "are the basic contract remedies of damages, reformation, and rescission"), *rehearing denied,* 51 Haw. 478, 462 P.2d 470 (1969). As *Matsuura* held, in cases where a party is allegedly defrauded, the majority of the jurisdictions allow the defrauded party an election of remedies. Accordingly, Plaintiffs should be allowed to file an independent action for fraud.

## V.

Second, an independent action best serves the policy of encouraging parties to voluntarily settle their cases, thereby avoiding prolonged litigation. *See Collins v. South Seas Jeep Eagle,* 87 Hawai'i 86, 90, 952 P.2d 374, 378 (1997) ("The purpose of [Hawai'i Rules of Civil Procedure (HRCP) ] Rule 68[, which governs offers of settlement or judgment,] is' to encourage settlement and avoid protracted litigation."); *Sylvester v. Animal Emergency Clinic of Oahu,* 72 Haw. 560, 565–66, 825 P.2d 1053, 1056 (1992) ("[A settlement] is an amicable method of settling or resolving bona fide differences or uncertainties and is designed to prevent or put an end to litigation." (Citation and internal quotation marks omitted.)); *Arakaki v. Arakaki,* 54 Haw. 60, 64, 502 P.2d 380, 383 (1972) (purpose of bill concerning property settlements during divorce proceedings was to conserve judicial resources), *rehearing denied,* 54 Haw. 298 (1973); *Page v. Domino's Pizza,* 80 Hawai'i 204, 209 n. 6, 908 P.2d 552, 557 n. 6 (App.1995) ("[S]ettlement provides a quick resolution of a case[.]").

In discussing the policy rationale for allowing the plaintiffs to bring an independent action for fraud, post-settlement, the *Florida Evergreen II* court observed that "[c]andor and fair-dealing are, or should be, the hallmark of litigation and required attributes of those who resort to the judicial process." 744 A.2d at 461. According to that court, if a settling party cannot rely on the good faith of the other party, "the policy of encouraging the settlement of cases is in jeopardy." *Id.*

The *Florida Evergreen II* court reasoned that to hold otherwise would "seriously undermine the requirement of *bona fide* in the execution of contracts and undermine confidence in the dispute resolution goal of promoting settlement of litigation." *Id.* at 462 (emphasis in original).

Similarly, in *Matsuura*, the Ninth Circuit also observed that allowing Plaintiffs to bring an independent action would "further Delaware's policy favoring voluntary settlement of legal disputes." 166 F.3d at 1012. The Ninth Circuit reasoned that "finality of settlements is based on the assumption that the parties have freely bargained to exchange the costs, risks and potential rewards of litigation for the certainty of a settlement that seems fair in light of facts known at the time." *Id.* (citing *In re Appraisal of Enstar Corp.*, 593 A.2d 543, 548 (Del.Ch.1991) (citing cases), *rev'd on other grounds*, 604 A.2d 404 (Del.1992). Hence, "[s]ettlements induced by fraud are set aside ... because the defrauded party has not freely bargained, but has been induced to settle by affirmative misrepresentations by the other party." *Id.* (citing *In re Appraisal of Enstar Corp.*, 593 A.2d at 549).

On the other hand, "[e]nforcing [a fraudulent] settlement would undermine the policy of encouraging voluntary settlement of disputes: if litigants cannot assume [that] the disclosures and representations of the opposing party are made in good faith, they will be reluctant to settle." *Matsuura*, 166 F.3d at 1012. As a result, "[d]enying the Matsuuras any further remedy would undermine rather than further [the] policy of encouraging voluntary settlement of claims." *Id.*

Like Delaware, our jurisdiction favors the settlement of disputes. *See Associates Fin. Servs. Co. of Hawai'i, Inc. v. Mijo*, 87 Hawai'i 19, 30, 950 P.2d 1219, 1230 (1998) ("[A] judge should encourage settlement throughout the case and particularly on the eve of trial."); *Gossinger v. Association of Apartment Owners of the Regency of Ala Wai*, 73 Haw. 412, 424 n. 5, 835 P.2d 627, 634 n. 5 (1992) ("Public policy favors the settlement of disputes without resort to the courts, provided such settlements are fairly reached." (Citation and internal quotation marks omit-

ted.)); *Sylvester v. Animal Emergency Clinic of Oahu*, 72 Haw. 560, 566, 825 P.2d 1053, 1056 (1992) (stating that "this court's policy [is] to foster amicable, efficient, and inexpensive resolutions of disputes" through compromise or settlement rather than by litigation).

Therefore, considerations enumerated by the Delaware Supreme Court and the Ninth Circuit apply here. Where disclosures and representations are not made in good faith, the parties "will be reluctant to settle." *Matsuura*, 166 F.3d at 1012. The "[a]ssurance of an adversary's good faith is particularly critical when parties are attempting to resolve a dispute amicably." *Id.* Thus, when the parties distrust each other, "the policy of encouraging the settlement of cases" is jeopardized. *Florida Evergreen II*, 744 A.2d at 461. In that regard, the availability of an independent action for fraudulent inducement would deter a potential fraudfeasor. The party whose misconduct has "vitiate[d] an amicable resolution of the dispute" would not be rewarded. *Id.* Consequently, the policy of encouraging settlements weighs in favor of allowing a subsequent independent fraud action. In sum, permitting Plaintiffs to file such an action would further the policy of encouraging settlements. *See Matsuura*, 166 F.3d at 1012.

## VI.

### A.

The second certified question asks:

Where plaintiffs' attorneys and others have accused the defendant of fraud and dishonesty during the course of prior, related litigation, are plaintiffs thereafter precluded as a matter of law from bringing a cause of action for fraudulent inducement to settle because they should not have relied on the [d]efendant's representations?

The majority answers the second certified question as requiring that Plaintiffs prove that "their reliance on the defendant's representations was reasonable." Majority opinion at 165, 73 P.3d at 703. As mentioned, I would answer the certified question in the negative. In this regard, I do not agree with the majority's belief that "reasonable reli-

ance" must be shown by Plaintiff under the circumstances of this case.

It is well settled in this jurisdiction that in order to establish an action for fraud, a plaintiff must prove that "(1) false representations were made by defendant[ ], (2) with knowledge of their falsity (or without knowledge of their truth or falsity), (3) in contemplation of plaintiff's reliance upon these false representations, and (4) *plaintiff did rely upon them.*" *Shoppe v. Gucci Am., Inc.,* 94 Hawai'i 368, 386, 14 P.3d 1049, 1067 (2000) (quoting *TSA Int'l Ltd. v. Shimizu Corp.,* 92 Hawai'i 243, 251, 990 P.2d 713, 725 (1999)) (emphasis added); *see also Shanghai Inv. Co. v. Alteka Co.,* 92 Hawai'i 482, 497, 993 P.2d 516, 531 (2000), *overruled on other grounds by, Blair v. Ing,* 96 Hawai'i 327, 329, 31 P.3d 184, 186 (2001); *Hawaii's Thousand Friends v. Anderson,* 70 Haw. 276, 286, 768 P.2d 1293, 1301 (1989); *Kang v. Harrington,* 59 Haw. 652, 656, 587 P.2d 285, 289 (1978); *Eastern Star, Inc., S.A. v. Union Bldg. Materials Corp.,* 6 Haw.App. 125, 140, 712 P.2d 1148, 1158 (1985); *Wolfer v. Mutual Life Ins. Co. of New York,* 3 Haw.App. 65, 70, 641 P.2d 1349, 1353 (1982). Defendant argues that Plaintiffs were unreasonable in relying on its representations during settlement negotiations because Plaintiffs knew about allegations that Defendant had engaged in dishonest conduct in discovery.

Essentially, Defendant asserts that the "reliance" in a fraud action must be "justifiable" or "reasonable." Defendant relies on *Florida Evergreen Foliage v. E.I. Du Pont De Nemours & Co.,* 135 F.Supp.2d 1271 (S.D.Fla.2001) [hereinafter *Florida Evergreen I* ]. The federal district court in that case held that, where the plaintiffs monitored the Benlate litigation in other courts, and had knowledge of Defendant's alleged fraud and dishonesty, the plaintiffs' reliance on Defendant's misrepresentations and omissions in deciding to settle was unreasonable *as a matter of law. See id.* at 1295.

I would not agree with the rationale in *Florida Evergreen I.* As between a fraudfeasor and an arguably negligent person, the law should not reward the fraudfeasor in light of the greater culpability inhering in fraudulent conduct. *Cf. Restatement (Second) of Contracts,* § 172, Reporter's Note

cmt. a., at 471 (1979) (The shift in ethical standards accepted by the community and the ... shift in the law of fraud are ... illustrated ... by the change in the law's requirement of diligence.... The great weight of authority today holds that ordinary contributory negligence is no defense to any action grounded on intentional fraud." (Quoting James & Gray, *Misrepresentation—Part II,* 37 Md. L.Rev. 488, 511 (1978).)).

## B.

### 1.

As is evident from the elements of an action for fraud in this jurisdiction, the question is whether "plaintiff did [in fact] rely upon [the false representations]." *Shoppe,* 94 Hawai'i at 386, 14 P.3d at 1067. As such, the law in this jurisdiction requires only actual reliance, not reasonable reliance. *See Hawaii's Thousand Friends,* 70 Haw. at 286, 768 P.2d at 1301 (requiring "that plaintiff did rely upon ... [the] false representations"); *Kang v. Harrington,* 59 Haw. 652, 656, 587 P.2d 285, 289 (1978) (requiring "that plaintiff did rely upon ... [the] false representations"); *Peine,* 46 Haw. at 238, 377 P.2d at 712 ("The [complaining] party must have relied and acted upon ... the fraudulent representations[.]").

It is undisputed that Plaintiffs "relied in fact on [Defendant's] misrepresentations[ ]" in their settlement negotiations. Thus, in the absence of Plaintiff's bad faith, *i.e.* actual knowledge that the subject facts were misrepresented, I believe only actual reliance is required. Therefore, in my view, Plaintiffs are not, as a matter of law, precluded from instituting a cause of action for fraudulent inducement based on Defendant's misrepresentations.

### 2.

Public policy requires the same result. As stated previously, a settlement agreement assumes that the parties have engaged in a fair and freely-bargained exchange. *See Matsuura,* 166 F.3d at 1012. Even if Plaintiffs knew about some of Defendant's prior fraudulent representations, Defendant did

not disclose the Costa Rica field tests at the time of the settlement. Here, based on the allegations, Plaintiffs can hardly be said to have "freely bargained." The "[a]ssurance of an adversary's good faith is particularly critical when parties are attempting to resolve a dispute amicably." *Id.* The availability of a potential fraudulent inducement action, then, would encourage settlements, aid in deterring misconduct, and thus avoid extended litigation.

In light of the foregoing, when Plaintiffs have been misled by Defendant's fraud and dishonesty during the course of prior, related litigation, Plaintiffs are not precluded as a matter of law and policy from instituting a cause of action for fraudulent inducement to settle based on Plaintiffs' reliance on Defendant's misrepresentations.